Rosa CARTER, Administratrix of the Estate of Adrian Miles Carter, Deceased, Plaintiff-Appellant, Cross-Appellee,

v.

CITY OF CHATTANOOGA, TENNESSEE, Defendant-Appellee, Cross-Appellant.

Nos. 84–5247, 84–5276.

United States Court of Appeals, Sixth Circuit.

Submitted Aug. 25, 1986.

Decided Oct. 6, 1986.

Rehearing Denied Nov. 7, 1986.

* John W. McClarty (lead), McClarty & Williams, Rheubin M. Taylor, Chattanooga, Tenn., for plaintiff-appellant, cross-appellee.

Eugene N. Collins, City Atty., Chattanooga, Tenn., Randall L. Nelson, for defendant-appellee, cross-appellant.

Before JONES and WELLFORD, Circuit Judges, and GILMORE, District зt Judge: *

GILMORE, District Judge.

In this case, plaintiff-appellant's son was shot and killed by Chattanooga police in

* The Hon. Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation.

**218**

December 1982 during an attempt to escape from the scene of a daytime burglary. Appellant sued under 42 U.S.C. § 1983, claiming that her son's Fourteenth Amendment rights had been violated by both the officer and the city.

At the time of the shooting, the City of Chattanooga trained its police officers in accordance with Tennessee's "fleeing felon" statute,[1] which authorized the use of deadly force to apprehend a fleeing felon after notice of intent to arrest. Subsequently, however, this Court decided *Garner v. Memphis Police Department*, 710 F.2d 240 (6th Cir.1983), *aff'd sub nom. Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), holding that the statute, and a city policy based on it, authorized unconstitutional "seizures" under the Fourth Amendment as applied to those suspected of committing non-dangerous felonies, who were not armed nor otherwise apparently dangerous.

After this Court's decision in *Garner*, plaintiff amended her complaint to include a Fourth Amendment claim, and moved for summary judgment as to liability, asking to try only the issue of damages. This motion was denied. Both the city and the officer also moved for summary judgment. The trial court granted the officer's motion, based on qualified immunity, but denied the city's motion, holding that this Court's § 1983 decision in *Garner* should be applied retroactively. The case was tried in January 1984, and the jury charged in accordance with our decision in *Garner*. The verdict was for the city, and this appeal followed. The city has cross-appealed, urging the Court to decide two additional issues, if it finds merit in plaintiff's claims of error.

Around 1:30 p.m. on December 21, 1985, Lt. Kyle and two other Chattanooga police officers arrived at 915 Vine Street in response to an indication from a silent burglar alarm. They observed that a window facing the carport was broken and open. Officer Eilders started to enter through the window but was restrained by Lt. Kyle, who felt that was too dangerous. Voices were heard from inside the house.

Lt. Kyle directed each of the others to cover a corner of the house. As he mounted the porch at the side of the home, he saw a male appear in the doorway, yell something, and disappear back into the house. Lt. Kyle radioed the dispatcher that there was a burglary in process and asked for additional units.

A fourth police officer arrived, and Lt. Kyle stationed him at a corner and went to the rear of the house to take the last remaining corner. Two men jumped off the porch on the right side of the house, and one (later identified as appellant's son, Carter) began running in a crouched position away from the house with an object in his right hand, which Lt. Kyle could not identify. Lt. Kyle twice ordered Carter to halt but he continued to run. As Carter approached the corner of the house, Kyle fired twice, slipped and fell. Carter was hit once, and died later at the hospital.

Lt. Kyle testified that Carter had said nothing to him or to the other officers prior to the shooting. He also testified that he had not attempted to chase Carter, and had shot him from some 45 to 55 feet away. He stated he had seen something in Carter's right hand, which later turned out to be a facecloth or a washcloth.

The verdict of the jury was for the city, and appellant has raised three issues on appeal. She first contends the trial court should have granted a motion for summary judgment on the issue of liability, allowing the jury to decide only the issue of damages. She next contends that the district court erred in denying her motion for judgment notwithstanding the verdict based on the evidence put before the jury, and she finally contends that she should be granted a new trial on the basis that the jury's

---

**1.** Tenn.Code Ann. § 40–808 (1975), subsequently recodified as § 40–7–108 (1982). The statute provides in pertinent part that "[I]f, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest."

verdict was against the great weight of the evidence.

Defendant has filed a cross appeal, arguing that the trial court erred in applying this Court's decision in *Garner* retroactively to deny the city summary judgment, and that the district court erred in sustaining an objection to its offer of proof by testimony of Chattanooga Police Commissioner Kennedy as to the nature of burglary as a violent crime in Chattanooga.

## II

The first issue is whether the district court erred in applying the law of *Garner* in the trial of this case. In *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court of the United States, affirming this Court, held that the Fourth Amendment prohibits the use of physical force to prevent the escape of a suspected felon, unless it is necessary to prevent the escape, *and* unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. It thus held the Tennessee statute unconstitutional insofar as it authorized the use of deadly force to prevent the escape of an apparently unarmed suspected felon:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.... A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee Statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

> It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to

the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. As applied in such circumstances, the Tennessee statute would pass constitutional muster.

471 U.S. at 11–12, 105 S.Ct. at 1701, 85 L.Ed.2d at 9–10.

The standards established by the Sixth Circuit, which were much the same as those of the Supreme Court, were used by the trial judge in charging the jury here.

The question is whether *Garner* should have been applied retroactively to the instant case. The incident involved here occurred on December 21, 1982. *Garner* was decided in this Court on June 16, 1983. Trial of this case commenced in January 1984, and *Garner* was decided in the Supreme Court of the United States on March 27, 1985.

As another panel of this Court recently pointed out, the general rule in civil cases is that a recent authoritative opinion interpreting the law should be applied to pending cases. In *Lawson v. Truck Drivers, Chauffeurs and Helpers, etc.*, 698 F.2d 250, 254 (6th Cir.1983), the court said:

> The normal rule is that in civil cases a recent authoritative opinion interpreting the law should be applied to pending cases unless it represents a "clean break" with the past and unless in addition it would be fundamentally unfair or otherwise burdensome to so apply it.

In considering the issue of nonretroactivity, the United States Supreme Court in *Chevron Oil v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), set forth a three-pronged analysis in determining whether an appellate decision in a civil case should be applied prospectively only:

In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Id.* at 106–07, 92 S.Ct. at 355.

Subsequently, in *United States v. Johnson,* 457 U.S. 537, 563, 102 S.Ct. 2579, 2594, 73 L.Ed.2d 202 (1982), the Court reiterated the *Huson* standards for civil retroactivity: "Finally, all questions of civil retroactivity continue to be governed by the standard enunciated in *Chevron Oil Company v. Huson,* 404 U.S. at 106–07 [92 S.Ct. at 355–56]."

An analysis of the three factors leads us to the conclusion that the trial court was correct in applying the standards of *Garner* retroactively.

In *United States v. Johnson, supra,* the Court discussed the three prongs of the *Huson* test:

In the civil context, in contrast, the "clear break" principle has usually been stated as the threshold test for determining whether or not a decision should be applied nonretroactively. See *e.g., Chevron Oil Co. v. Huson,* 404 U.S. 97, 106 [92 S.Ct. 349, 355, 30 L.Ed.2d 296] (1971). Once it has been determined that a decision has "establish[ed] a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed," the Court has gone on to examine the history, purpose, and effect of the new rule, as well as the inequity that would be imposed by its retroactive application. *Id.,* at 106–107 [92 S.Ct. at 355–56]. See also *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 499 [88 S.Ct. 2224, 2234, 20 L.Ed.2d 1231] (1968).

*Id.* at 550 n. 12, 102 S.Ct. at 2587 n. 12.

From this it can be seen that the three prongs of the *Huson* tests are not equivalent. The first—whether the decision represented a clear break from prior precedent or practice—is a threshold test. If a decision does not meet this first test, the analysis is over, and the court need not proceed to apply the other two *Huson* prongs.

The first criterion of the *Huson* test is that decisions are to be applied retroactively unless they establish a new principle of law, either by overruling clear past precedent on which litigants have relied or by deciding an issue of first impression whose resolution is not clearly foreshadowed.

Three years prior to this Court's 1983 decision in *Garner,* a panel of this Court issued an earlier opinion in the *Garner* case, remanding the case in light of the Supreme Court's decision in *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See Garner v. Memphis Police Dep't,* 600 F.2d 52 (6th Cir.1979) (hereinafter known as "the first *Garner* case"). In the first *Garner* case, the court specifically left open the following question in the case against the city: "Is a municipality's use of deadly force under Tennessee law to capture allegedly nondangerous felons fleeing from nonviolent crimes constitutionally permissible under the Fourth, Sixth, Eighth and Fourteenth Amendments?" *Id.* at 55. In addition, the court in the first *Garner* case held that: "Our previous decisions do not establish the constitutionality of Tenn.Code Ann. § 40–808, permitting a city to authorize its

officers to use deadly force against a fleeing felon." *Id.* at 54.

Prior to that decision, a three-judge district court had upheld the facial constitutionality of the statute in question in *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971), and this court had declared the statute constitutional in *Beech v. Melancon,* 465 F.2d 425 (6th Cir.1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973), and *Wiley v. Memphis Police Department,* 548 F.2d 1247 (6th Cir.), *cert. denied* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977).

The first *Garner* case distinguished *Beech* and *Wiley,* as well as another case from this circuit, *Qualls v. Parrish,* 534 F.2d 690 (6th Cir.1976). Thus, the very issue that was eventually decided in the second *Garner* case, which was applied by the trial court here, was declared in the first *Garner* case to be an open question in this circuit in 1979, more than two years after *Wiley,* and more than three years before the shooting in the instant case. As an earlier decision in the same case, the first *Garner* opinion represents the law of the case in the very case which appellee argues was such a sharp break with past precedent that it should not apply retroactively. Appellee apparently disagrees with the reasoning that led the first *Garner* court to its decision, but, correct or incorrect, that was indisputably the law of this circuit after that decision. *See Taylor v. Collins,* 574 F.Supp. 1554, 1557–58 (E.D. Mich.1983), applying the second *Garner* case retroactively.

Furthermore, it is clear that within the country at large this was an area very much in turmoil. As the Supreme Court noted in *Garner:*

It cannot be said that there is a constant or overwhelming trend away from the common-law rule. In recent years, some States have reviewed their laws and expressly rejected abandonment of the common law rule. Nonetheless, the long-term movement has been away from the rule that deadly force may be used against any fleeing felon, and that remains the rule in less than half the States.

This trend is more evident and impressive when viewed in light of the policies adopted by the police departments themselves. Overwhelmingly, these are more restrictive than the common-law rule.... The Federal Bureau of Investigation and the New York City Police Department, for example, both forbid the use of firearms except when necessary to prevent death or grievous bodily harm. For accreditation by the Commission on Accreditation for Law Enforcement Agencies, a department must restrict the use of deadly force to situations where "the officer reasonably believes that the action is in defense of human life ... or in defense of any person in immediate danger of serious physical injury." Commission on Accreditation for Law Enforcement Agencies, Ind., Standards for Law Enforcement Agencies 1–2 (1983) (italics deleted). A 1974 study reported that the police department regulations in a majority of the large cities of the United States allowed the firing of a weapon only when a felon presented a threat of death or serious bodily harm.... Overall, only 7.5% of departmental and municipal policies explicitly permit the use of deadly force against any felon; 86.8% explicitly do not....

In light of the rules adopted by those who must actually administer them, the older and fading common-law view is a dubious indicium of the constitutionality of the Tennessee statute now before us.

471 U.S. at 18–19, 105 S.Ct. at 1705, 85 L.Ed.2d at 14.

At the time *Garner* was decided in the United States Supreme Court, 20 states had adopted a version of the Model Penal Code § 3.07(2)(b) prohibiting the use of deadly force, except in the circumstances set forth in the *Garner* case, and two other states had prohibited the use of deadly force to prevent any but violent felonies. *Id.* at 17, 105 S.Ct. at 1704, 85 L.Ed.2d at 13. And, as early as 1967, the President's Commission on Law Enforcement and the

Administration of Justice issued a task force report recommending that the use of deadly force by police officers be limited to circumstances where it is essential to physical protection or where violence had been used in the felony. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police 189 (1967).

In 1970, the National Commission on Reform of Federal Criminal Laws came to much the same conclusion in a study draft of a new Federal Criminal Code. U.S. Nat'l Commission on Reform of Fed.Crim. Laws, Study Draft of a New Fed.Crim. Code § 607(2)(d) (1970). By then, numerous legal scholars had written in favor of the more restrictive view of the use of deadly force.[2]

Prior to *Garner*, several federal courts of appeal had found the use of deadly force by police unlawful in certain circumstances. In *Jenkins v. Averett*, 424 F.2d 1228 (4th Cir.1970), the court found a Fourth Amendment violation where a police officer accidently shot a fleeing youth, whom the officer believed was armed, on the grounds that the officer was "grossly or culpably negligent." In *Jones v. Marshall*, 528 F.2d 132, 140 (2d Cir.1975), the court stated its view that:

> [T]he preferable rule would limit the privilege [to use deadly force in arresting felony suspects] to the situation where the crime involved causes or threatens death or serious bodily harm, or where there is a substantial risk that the person to be arrested will cause death or serious

bodily harm if his apprehension is delayed.

The court nevertheless held that:

> While the Fourteenth Amendment may require us to make an independent assessment of the fairness of the state rule, ... we are today interpreting Section 1983, and within that statute the states must be given some leeway in the administration of their systems of justice, at least insofar as determining the scope of such an unsettled rule as an arresting officer's privilege for the use of deadly force.

*Id.* at 142.

In *Mattis v. Schnarr* 547 F.2d 1007 (8th Cir.1976), the court performed a due process analysis of a Missouri statute quite similar to the Tennessee statute, and found it unconstitutional as applied against fleeing felons who have not used deadly force in the felony, and whom the officer does not reasonably believe will use such force against the officers, if not immediately arrested. Although the judgment in that case was later vacated as moot, *Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977), and the reasoning was specifically rejected in *Wiley*, these decisions should have served to put city attorneys within this circuit on notice that the law in this area was in a state of flux. Within this broader national context, it would have been unreasonable for city attorneys within this circuit to have blindly trusted in the authority of *Wiley* in light of this court's express statement in the first *Garner* case that the constitutionality of

---

**2.** Greenstone, Liability of Police Officers for Misuse of Their Weapons, 16 Clev.-Mar.L. Rev. 397 (1967); Note, Justification: The Impact of the Model Penal Code on Statutory Reform, 75 Colum.L.Rev. 914 (1975); Comment, The Use of Deadly Force in the Protection of Property Under the Model Penal Code, 59 Colum.L.Rev. 1212, 1218 n. 35 (1959); Tsimbinos, The Justified Use of Deadly Force, 4 Crim.L.Bull. 3 (1968); McDonald, Use of Force by Police to Effect Lawful Arrest, 9 Crim.L.Q. 27 (1967); Perkins, The Law of Arrest, 25 Iowa L.Rev. 201 (1940); Comment, The Use of Deadly Force in Arizona by Police Officers, 1973 L. & Soc.Order 481, 482 (1973); Pearson, The Right to

Kill in Making Arrest, 28 Mich.L.Rev. 957 (1930); Wilgus, Arrest Without a Warrant, 22 Mich.L.Rev. 541, 569 (1924); Moreland, The Use of Force in Effecting or Resisting Arrest, 33 Neb.L.Rev. 408 (1954); Note, Criminal Law—Use of Deadly Force in Preventing Escape of Fleeing Minor Felon, 34 N.C.L.Rev. 122 (1955); Note, Justification for the Use of Force in the Criminal Law, 13 Stan.L.Rev. 566 (1961); Bohlen & Shulman, Arrest With and Without a Warrant, 75 U.Pa.L.Rev. 485, 495 (1927); Note, Legalized Murder of a Fleeing Felon, 15 Va.L. Rev. 582 (1929); Note, Justifiable Use of Deadly Force by the Police; A Statutory Survey, 12 Wm. & Mary L.Rev. 67 (1970).

the statute under the Fourth Amendment was an open one. This Court cannot conclude that the second *Garner* decision represented the sort of clear break with established authority contemplated by the first prong in *Huson.* It is therefore clear that our consideration of this first prong calls for a retroactive application of that decision.[3]

As the Supreme Court pointed out: " ... [T]he long term movement has been away from the rule that deadly force may be used against any fleeing felon, and that remains the rule in less than half the states." 471 U.S. at 18, 105 S.Ct. at 1705, 85 L.Ed.2d at 14. It therefore is clear that this case was not a clear break with past precedent. There were clear trends among the states and many courts of appeal to put limits such as those imposed in *Garner* upon the use of deadly force to apprehend a fleeing felon. It is clear to us that the first factor of *Huson* against nonretroactivity has been met.

The application of the second *Huson* factor militates in favor of applying *Garner* retroactively. This factor calls for weighing the merits and demerits of retroactive application in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.

As the Supreme Court said about this prong of the test in *Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965):

We believe that this approach is particularly correct with reference to the Fourth Amendment's prohibitions as to unreasonable searches and seizures. Rather than "disparaging" the Amendment we but apply the wisdom of Justice Holmes that "[t]he life of the law has not been logic: it has been experience." Holmes, *The Common Law* 5 (Howe Ed.1963).

The purpose of the ruling in *Garner* was to insure that victims of unconstitutional state action are compensated fairly for constitutional violations. By declining to apply the decision retroactively, the district court would have hindered rather than furthered the goal of 42 U.S.C. § 1983. It is clear now that the policy of allowing deadly force to be used against every fleeing felon, even where he presents no danger to the officer or other people, cannot be squared with the Constitution.

An award in damages in this case would serve not to punish the city but to compensate appellant for the result of the city's unconstitutional conduct. The question is not whether the city intentionally violated the Constitution or whether it continues to do so, but whether compensation would be so inimical to the goals at issue that this case must be placed into the exception to the usual rule of retroactive application. This was, after all, an action under § 1983, which is a statute designed to insure that victims of unconstitutional state action are fairly compensated for the violation. By declining to apply *Garner* retroactively in this case, the district court would have hindered, rather than furthered, the goals of Section 1983.

We have already decided that the second *Garner* decision in the Sixth Circuit was significantly foreshadowed by the first *Garner* decision, and other events. It is clear now that the policy of allowing deadly force to be used against every fleeing felon, even where he presents no danger to the officer or others, cannot be squared with the Constitution. In *Garner* itself, the Supreme Court struck down a well-established Tennessee practice long relied upon, and its ruling was not prospective only. There was no more forewarning to the city in *Garner* of the liability that would attach than there was here. Yet, the Court in *Garner* directed the suit for damages to proceed. It is logical that in this case the Court should apply the teaching of *Garner.* Consideration of the second *Huson* prong calling for the balancing

---

**3.** For a comprehensive discussion of the trend of the law in the fleeing felon rule, see Comment, *The Unconstitutional Use of Dead-* *ly Force Against Nonviolent Felons,* 18 Georgia Law Review, 137 (1983).

of the merits and demerits of prospective only application weighs in favor of the retroactive application of *Garner* to this case.

Similarly, the application of the third *Huson* factor counsels retroactivity. ·In the third factor, the court is required to weigh the inequity that would be imposed by retroactive application. While we recognize that some municipalities will be subject to unanticipated damage awards under 42 U.S.C. § 1983, despite good faith efforts to comply with the law, the inequity would be still greater if the court refused to apply the *Garner* precedent retroactively here. Such a refusal would result in the sad anomaly of affording Mr. Garner a new trial in Memphis for the shooting of his son while denying Mrs. Carter a new trial for the shooting of her son eight years later in Chattanooga under the same statute.

It is therefore clear to the Court that all three prongs of the *Huson* test have been met and the *Garner* decision was properly applied retroactively by the district court in the instant case.

### III

█ Appellant next contends that the issue of liability in this case should not have been put to the jury, but that the case should have been sent to the jury only on the question of damages. She filed a motion for partial summary judgment, claiming that the undisputed facts showed that there was no probable cause for Lt. Kyle to have believed that the deceased presented a danger to the officers or to others. This motion was denied by the district court, which concluded that the record was not clear enough to enable it to determine as a matter of law that Lt. Kyle's actions violated the standards of *Garner*. The court pointed out that the facts relevant to the disposition of the motions were not in dispute. It said:

At about 1:30 on the afternoon of December 21, 1982, the plaintiff's decedent, Adrian Miles Carter, was discovered in the act of burglarizing a house at 915 Vine Street, in Chattanooga, Tennessee. Defendant Kyle and two other police officers of Chattanooga arrived at the house after having been notified that a silent burglar alarm had indicated an unauthorized entry into the house. Upon seeing the police, Carter attempted to flee, was ordered to halt by Lt. Kyle, and, after failing to do so, was shot by Kyle. Carter later died at the hospital. To Kyle's knowledge, Carter was unarmed, had made no threats of harm to any police officer or any other person, and was attempting to flee from a daylight burglary of a residence.

Kyle was acting within the course and scope of his employment as a police officer of the City of Chattanooga at the time this incident occurred. The defendant Chattanooga, a municipal corporation organized under the laws of Tennessee, maintained written policies in the form of general orders in its police manual governing the use of force in the apprehension of fleeing felony suspects. One section of the manual contains by reference the provisions of a Tennessee statute, Tenn.Code Ann. § 40–7–108, which provides:

*Resistance to officer.*—If, after notice of intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary means to effect the arrest.

According to Lt. Kyle's affidavit, which is uncontroverted, he did not believe there was any other way of apprehending Carter, and that if the measures which were taken had not been taken, Carter would have escaped. Kyle further avers that he knew that the conduct in which Carter had been engaged had been a felony under the laws of Tennessee. Finally, Kyle asserts that he believed in good faith that he was authorized to use deadly force to apprehend a fleeing felon by the laws of Tennessee, and the policies of Chattanooga contained in his police manual.

*Carter v. City of Chattanooga,* Nos. 84–5247 & 84–5276, at 2–3 (E.D.Tenn. filed Jan. 27, 1984).

In a thorough and careful opinion, Judge Milburn concluded that *Garner* should be applied to the case and that the City's policy of the use of deadly force was unquestionably unconstitutional. The district court found, however, that whether the actions of Kyle satisfied the standards of *Garner* was an issue of fact that should be submitted to a jury. The court therefore denied the motion for summary judgment.

Although this Court is of the opinion that the facts set forth by the trial court provide a sufficient basis to direct the issue of liability [4], the Court does not feel that it was error for the district court to deny the motion for summary judgment. The findings made in ruling on the summary judgment motion do not exclude proof of other circumstances which might have permitted the use of deadly force under *Garner*. Evidence might have been presented at trial, for example, that Kyle knew that appellant's son, Carter, had a reputation for violence, or that he knew of some violent circumstances surrounding the commission of the crime,—for example, that someone had been assaulted in the home. It is also possible that at trial Kyle might have identified a certain distinctive *modus operandi* tying the burglary to other recent burglaries that had been violent. In short, we do not think that the findings made by the district court on summary judgment necessarily exclude the existence of such circumstances under which the Tennessee statute could pass constitutional muster. Therefore, we cannot say it was error for the court to deny the motion for summary judgment and allow the issue of liability to go to trial.

## IV

■ The case proceeded to trial, and a judgment of no cause for action was rendered for the city. Appellant then moved for judgment notwithstanding the verdict, based upon the evidence that was presented to the jury. This motion was denied, and appellant urges this Court to reverse

4. See discussion, *infra*, at 226–228.

and remand for trial on the issue of damages only.

In deciding a motion for judgment n.o.v., the court

> may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor.

*Morelock v. NCR Corp.*, 586 F.2d 1096, 1104 (6th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

The standard of review on appeal is the same as the standard used by the trial court, namely, whether reasonable minds could differ. 9 Wright & Miller, *Federal Practice and Procedure* § 2524 at 541–46. Therefore, if some evidence in this case, viewed in the light most favorable to the city, could reasonably give probable cause for a belief on the part of Lt. Kyle that Carter posed a significant threat of death or serious physical harm to him or others, the motion for a judgment n.o.v. must be denied. On the other hand, if there is no evidence which would give Lt. Kyle probable cause to feel that there was a significant threat of death or serious physical harm to him or others, then the district court erred in denying the motion for a judgment n.o.v.

Lt. Kyle had earlier been dismissed from the case because the court found he was acting in good faith, and this dismissal is not challenged.

We find that the district court erred in not granting the motion, setting aside the verdict, and granting judgment n.o.v.

Significant in making this decision is the testimony of Lt. Kyle. Lt. Kyle testified that Carter had said nothing to him or to the other officers prior to the shooting, that he had not seen a weapon, but had seen "something" in Carter's right hand, and had not tried to chase Carter down. As it turned out, Carter had a facecloth or

a washcloth in his hand. Kyle testified that Carter was some 45 to 55 feet away when he fired. Lt. Kyle further testified that it was his understanding that, under the police manual, there were three occasions when the use of deadly force was authorized:

1. To protect the citizens and their property;

2. To protect himself;

3. To stop a fleeing felon.

(Jt.App. 73)

In this instance, he justified his shooting under the third category, namely, stopping a fleeing felon and protecting property in the apprehension of the suspect. He testified as follows:

Q. Your life was not in danger; you were not being apprehended by this young man, anything of that nature?

A. Not that I know of.

Q. And you shot in an attempt to stop this young man who you consider a fleeing felon, is that correct?

A. Yes, sir.

(Jt.App. 74.)

Later, in answer to the question:

Did you consider him to be dangerous to the community or to the public if he hadn't been captured?

Kyle responded:

A. Anyone is dangerous to me that is inside a building or residence that has forced their way in, because we have no way of knowing whether or not they are armed. In most instances, whoever breaks in a business or residence has used some kind of weapon to break in. Therefore I did not know that, if he was armed or not armed.

Q. Did you have what is called probable cause to believe that he was armed?

A. I could say yes, because the window being broken out, and I did not see anything on the outside that would show a weapon was left outside the residence.

Q. Tell me this, then ... where was your probable cause that you consider this man was armed?

A. He was running with something in his right hand, which I could not tell what it was.

Q. Basically you shot because this was a fleeing felon. Isn't that correct, Officer?

A. I shot because he was a burglar. He was fleeing the scene and he failed to yield to halt.

(Jt.App. 77–79).

Later on, the following testimony was given:

Q. And you shot simply because this was a fleeing felon?

A. And he was at the scene of a burglary. Yes, sir.

(Jt.App. 84).

Lt. Kyle later testified that, from his 23 years' experience on the police force, he has observed that burglars usually take money, jewelry and guns. Then there was the following exchange:

Q. There were no threats, is that correct?

A. No, sir.

Q. You did not have any probable cause to believe he was armed, is that correct?

A. Except for him running with something in his right hand. That's all.

Q. And had he demonstrated to you, in your presence, or did you have cause to believe, that he created a danger to the community or to anyone else?

A. Well, if he had gotten away, he could have inflicted other damages to other houses or committed burglary right on.

Q. But there wasn't anything you saw at the time that you shot that gave you probable cause to believe that?

A. No, sir.

Q. Isn't that correct? And that you shot simply because you had caught him in the process, in the act of committing a felony, and he was attempting to get away?

A. True.

(Jt.App. 103–104).

The record is quite clear that the only reason that Lt. Kyle shot Carter was be-

cause he had caught him in a burglary and Carter was in the act of fleeing from a burglary. Lt. Kyle's own testimony shows that at no time did he feel that his life, or the life or well-being of any other person, was threatened.

Appellee's position is that burglaries are inherently dangerous situations. The aspect of the case repeatedly mentioned by Lt. Kyle, apart from the simple fact that Carter was a fleeing felony suspect, is that he was fleeing from the scene of a burglary and, in Lt. Kyle's view, presumed dangerous.

No one questions that it is good police work to assume that where a burglary is in progress one must conduct the investigation at the scene with great caution. But it does not necessarily follow that, because a burglary should be approached as a *potentially* dangerous situation, an investigating officer automatically has probable cause to use deadly physical force to apprehend any suspect who attempts to flee the scene. Indeed, the United States Supreme Court addressed this very issue in the context of the nighttime burglary in *Garner*:

> While we agree that burglary is a serious crime, we cannot agree that it is so dangerous as automatically to justify the use of deadly force. The FBI classifies burglary as a "property" rather than a "violent" crime.... Although the armed burglar would present a different situation, the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous. This case demonstrates as much.... In fact, the available statistics demonstrate that burglaries only rarely involve physical violence. During the 10–year period from 1973–1982, only 3.8% of all burglaries involved violent crime.

471 U.S. at 21, 105 S.Ct. at 1706, 85 L.Ed.2d at 16.

Thus, Lt. Kyle's belief that burglaries in general are dangerous situations cannot, without more, be the basis for a finding of probable cause to believe that this particular burglary suspect presented a danger to the officers or to the community. Although Lt. Kyle's testimony that he saw an object in Carter's hand and that a window into the house had been broken might have given him a bare suspicion that the intruders might be armed, this Court cannot say that these observations gave rise to probable cause. The fact a window is broken is some slight evidence of use of a weapon, but it is hardly conclusive. Furthermore, it is hard to imagine how Lt. Kyle could have mistaken a washcloth in Carter's hand for a weapon as he fled from the scene of this early-afternoon crime. Officer Eilders, who was also at the scene and observed the fleeing suspects, did not see any weapon upon either suspect.

It is clear from a thorough review of the record, especially from Lt. Kyle's own testimony, that Lt. Kyle fired because he thought Carter was about to escape from a suspected burglary, and that he had been trained to use deadly force to prevent that. The use of force under such circumstances is not justified under *Garner*. *Garner* specifically holds that deadly force may not be used to apprehend the suspect in a nonviolent felony unless it is necessary to prevent an escape, and the officer has probable cause to believe that the suspect is armed, or otherwise poses a significant threat of death or serious injury to the officer or others.

In this case, there can be no dispute that Lt. Kyle did not have probable cause to believe that the suspect posed a significant threat of death or serious physical injury to anyone. In fact, he essentially admitted that he shot Carter simply because he had caught him in the process of a burglary and he was attempting to escape.

The Fourth Amendment does not allow the use of deadly force in such circumstances, and the trial judge should have granted a judgment n.o.v. Therefore we hold that there is no issue of fact on the question of liability in this case. A verdict of liability should have been directed. The

case is remanded to the trial court for a trial on the issue of damages only.[5]

Reversed and remanded.

WELLFORD, Circuit Judge, dissenting:

I find the majority's retroactivity treatment to be erroneous under a proper analysis of *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), and its progeny. I therefore dissent. The majority correctly selects the *Chevron Oil* test as the appropriate standard in determining whether invalidation of the fleeing felon rule, as previously authorized by statute in Tennessee, should be applied retroactively to impose liability on the City of Chattanooga for relying on and enforcing that rule in 1982. Despite the majority's effort to minimize the clear legal status of the fleeing felon rule at the time the shooting took place in this case, a proper application of the *Chevron Oil* test and a careful review of the rule's constitutional validity at the time of the fatal shooting indicate that this court's decision in *Garner v. Memphis Police Dep't*, 710 F.2d 240 (6th Cir.1983) (hereinafter *Garner II*), and the Supreme Court's affirmance in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), should not be retroactively applied.

The initial hurdle that must be overcome before a court ruling is given retroactive effect is a determination of whether the decision marks a "new principle of law, either by overruling clear past precedent on which litigants may have relied ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed...." *Chevron Oil*, 404 U.S. at 106, 92 S.Ct. at 355. Subsequent Court statements have given substance to the "clear break" principle, suggesting that a decision should not be given retroactive effect when it involves a "newly minted principle," *United States v. Johnson*, 457 U.S. 537, 549, 102 S.Ct. 2579, 2586, 73 L.Ed.2d 202 (1982); "marks a sharp break in the web of

the law;" or "disrupts a practice long accepted and widely relied upon...." *Milton v. Wainwright*, 407 U.S. 371, 381–82 n. 2, 92 S.Ct. 2174, 2180 n. 2, 33 L.Ed.2d 1 (1972) (Stewart, J., dissenting). Further, the *Johnson* Court set forth a comprehensive discussion of considerations suggesting nonretroactive application of a court ruling when that decision represents a clear break from prior law:

In general, the Court has not subsequently read a decision to work a "sharp break in the web of the law, ..." unless that ruling caused "such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one, ...." Such a break has been recognized only when a decision explicitly overrules a past precedent of this Court, ... or disapproves a practice this Court arguably has sanctioned in prior cases, ... or overturns a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved. See, *e.g.*, *Gosa v. Mayden*, 413 U.S., [665] at 673 [93 S.Ct. 2926, 2932, 37 L.Ed.2d 873 (1973)] (plurality opinion) (applying nonretroactively a decision that "effected a decisional change in attitude that had prevailed for many decades"); *Stovall v. Denno*, 388 U.S., [293] at 299–300 [87 S.Ct. 1967, 1971–72, 18 L.Ed.2d 1199 (1967)]. See also *Chevron Oil Co. v. Huson*, 404 U.S. 97, 107 [92 S.Ct. 349, 355, 30 L.Ed.2d 296] (1971); *Cipriano v. City of Houma*, 395 U.S. 701 [89 S.Ct. 1897, 23 L.Ed.2d 647] (1969); *Milton v. Wainwright*, 407 U.S. at 381–382, n. 2, 92 S.Ct. at 2179–2180, n. 2 (Stewart, J., dissenting) ("sharp break" occurs when "decision overrules clear past precedent ... or disrupts a practice long accepted and widely relied upon").

457 U.S. at 551–52, 102 S.Ct. at 2588 (citations omitted).[1] The underlying concern

---

5. We find the second claim of the cross-appeal—that the district court erred in excluding Commissioner Kennedy's testimony—without merit.

1. Although *Johnson* concerns the retrospective application of a criminal procedure ruling to convictions still pending on appeal, and not to retroactivity in civil cases, the threshold test under *Chevron Oil* and *Johnson*

expressed in these cases is the inequity and harshness retroactive application of a new rule of law would impose on parties who had no significant reason to doubt the invalidity or unconstitutionality of a statute or practice. A review of the fleeing felon rule's history indicates that *Garner* overturned "a longstanding and widespread practice" the Supreme Court had previously not addressed, "but which a near-unanimous body of lower court authority ha[d] expressly approved." *Id.* at 551, 102 S.Ct. at 2588.

The fleeing felon rule originated early at common law and still constituted the law after nearly two hundred years in this country in approximately one half of the states, including Tennessee at the time *Garner* was decided. *Garner,* 105 S.Ct. at 1703–04 n. 14–16. Tennessee was one of nineteen states that had codified the principle. Legislatures in some states had abandoned the rule by opting for the Model Penal Code language or had curtailed the rule by permitting use of deadly force only in certain circumstances. *Id.* at 1704 n. 17–18. Significantly, none of the states that had abandoned the common law rule cited any constitutional basis for their decisions, but concluded as a matter of their own policy that the old rule should be replaced or modified. *See Garner,* 105 S.Ct. at 1702–06; *see also Sauls v. Hutto,* 304 F.Supp. 124 (E.D.La.1969) (quoting Prof. Wechsler's statement of the basis for the Model Penal Code position: "[t]he preservation of life has such moral and ethical standing in our culture and society, that the deliberate sacrifice of life merely for the protection of property ought not to be sanctioned by law." *Id.* at 131 n. 18, *quoting from* 1958 American Law Institute proceedings at pp. 285–86).

Prior to this court's *Garner II* decision, no court had struck down the fleeing felon rule as unconstitutional as an unreasonable search and seizure under the fourth amendment. To the contrary, we had on three

occasions upheld the Tennessee statute as constitutional.

The first case to examine the Tennessee statute was *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971), decided by a three-judge panel consisting of Circuit Judge Harry Phillips, then Chief District Court Judge Bailey Brown, and District Judge Robert McRae. Plaintiffs in *Cunningham* brought a wrongful death action under 42 U.S.C. § 1983 against police officers, the police director, and the mayor and also challenged the constitutionality of the Tennessee fleeing felon statute. The three-judge panel was convened "to hear and determine *only* the question of the facial constitutionality of the involved statute." *Id.* at 1074 (emphasis added). Plaintiffs attacked the statute as violative of the eighth amendment's prohibition against cruel and unusual punishment; as unconstitutionally vague and overbroad; as a denial of sixth amendment rights to trial by jury, to confrontation of witnesses, to assistance of counsel; and as a denial of equal protection. That court rejected these numerous constitutional arguments and held that the statute is not "unconstitutional on its face." *Id.* at 1076.

One year after the court reached its decision in *Cunningham,* we again addressed this issue, concluding significantly:

This Statute [Tennessee's fleeing felon statute] has been recently construed and found to be constitutional by a Three-Judge District Court. *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn. 1971). *In any event the police officers were entitled to assume the constitutionality of the Tennessee Statute. "State statutes like federal ones are entitled to the presumption of constitutionality until their invalidity is judicially declared...."*

*Beech v. Melancon,* 465 F.2d 425, 426 (6th Cir.1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973) (citations

are essentially the same. The *Johnson* Court relied on several civil retroactivity cases in defining when a decision presents a clear break from past precedent. Thus

the *Johnson* Court's amplification on when a clear break in law has been demonstrated is equally applicable to civil cases under the *Chevron Oil* analysis.

omitted) (emphasis added). In a concurring opinion, however, Judge McCree expressed his own reservation about the constitutionality of the rule.

Once again this court examined the Tennessee statute in *Wiley v. Memphis Police Department*, 548 F.2d 1247 (6th Cir.), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977). In *Wiley* police officers shot and killed a nighttime burglar who tried to flee when the officers caught him in the act of burglary. In reiterating the constitutionality of Tennessee's statute, the panel emphasized that the statute had twice been upheld as constitutional in *Cunningham* and *Beech* and that the statute's "invalidity, or that of a similar statute, up to [the time of the shooting] had never been declared by any Court." *Id.* at 1250–51. Turning its attention to the four-to-three en banc Eighth Circuit decision in *Mattis v. Schnarr*, 547 F.2d 1007 (1976), *vacated as moot sub nom. Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977), which had found the fleeing felon rule violative of substantive due process, the panel strongly criticized the *Mattis* majority:

> The Eighth Circuit is the only Court to our knowledge which has ever held that such a statute, which is so necessary even to elementary law enforcement, is unconstitutional. It extends to the felon unwarranted protection, at the expense of the unprotected public.
>
> We agree with the dissent in the Eighth Circuit case (*Mattis v. Schnarr*), which was highly critical of the majority opinion for not following the decisions of other Circuits and for embarking on a new course which should have been left to the state legislatures where it belongs.

*Id.* at 1252. Concluding that the statute was constitutional, the panel found:

> We are of the opinion further that MPD, the City, the Mayor, and the former Mayor, and the Chief of Police had the same right to rely on the law of Tennessee and the decisions of this Court and the decision of the three-Judge Court in formulating their policies. Also, *they*

*could rely on the presumption that the Tennessee statute was constitutional and on the fact that no court at that time had ever held that statute or a similar statute to be unconstitutional.*

*Id.* at 1254 (emphasis added). Concurring only in the result, Judge McCree stated:

> I concur in the result.... The district court, however, relied both on the fact that the officers could not have known whether the fleeing persons were armed and on the fact that no other means existed by which they could have been apprehended. There is sufficient evidence in the record to support the conclusion that the fleeing felons in this case did present an apparent threat to human life, and therefore I join in the decision of the court.

*Id.* at 1256.

Thus, until *Garner II*, we had repeatedly upheld the constitutionality of the fleeing felon rule, overruling a number of different challenges. Similarly, the Second Circuit in *Jones v. Marshall* had concluded that the fleeing felon rule presented no fourteenth amendment violation. 528 F.2d 132, 142 (2d Cir.1975). Although the Second Circuit expressed its opinion that the common law rule should be changed as a matter of policy, the court declined to find the challenged action unconstitutional. The court held this issue to be a matter entrusted to the sound policymaking of state legislatures. *Id.* See also Note, *The Unconstitutional Use of Deadly Force Against Nonviolent Fleeing Felons: Garner v. Memphis Police Department*, 18 Ga.L.Rev. 137, 144 n. 30 (1983) (citing state cases to the same effect).

As previously noted, one court did find the fleeing felon rule to violate substantive due process in *Mattis v. Schnarr*, 547 F.2d 1007 (8th Cir.1976) (en banc) (4–3 decision), *vacated as moot sub nom. Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). A bare majority of the Eighth Circuit concluded that the longstanding common law rule could not withstand constitutional scrutiny.

Three dissenting judges, whose rationale was later adopted by this court in *Wiley,* challenged the validity of the majority's constitutional analysis:

> Thus, after a background of five centuries of the common law and two centuries of this country's existence, lo and behold the majority, *ipse dixit,* has held that the common law principles embodied in these Missouri statutes are violative of the Due Process Clause of our Constitution. While acknowledging that other courts have reached a contrary decision, the majority shows no interest in the direction taken by other judicial authorities and turns elsewhere for guidance. . . .
>
>     \*     \*     \*     \*     \*     \*
>
> Indeed, prior to this decision, no court has held that the modification of a statute of this sort falls within the judicial purview delimited by the separation of powers contained in our Constitution.
>
>     \*     \*     \*     \*     \*     \*
>
> On the other hand, the majority does not cite, nor can I find, any state where the common law rule on the use of deadly force, either codified or uncodified, has been invalidated by either a state or federal court. Those courts faced with attacks on the common law rule allowing all force reasonably necessary to effect the arrest of fleeing or resisting felons have consistently held that these attacks present policy questions for the legislature, not the judiciary. *Jones v. Marshall,* 528 F.2d 132 (2d Cir.1975); *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971) (three-judge court); *Hilton v. State,* 348 A.2d 242 (Me.1975); *Shumann v. McGinn,* [307 Minn. 446], 240 N.W.2d 525 (Minn.1976).

547 F.2d at 1021–22 (Gibson, C.J., Stephenson, J., Henley, J., dissenting) (footnote omitted). Significantly, the precedential value of the majority view in *Mattis* was destroyed when the Supreme Court vacated the decision as moot the following year.

Despite a dearth of case law that questioned the validity of the common law rule, and despite the existence of a "near-unanimous body of lower court authority" expressly upholding the rule's constitutionality, somehow the panel majority discovers *Garner* not to present a clear break from prior precedent. The panel majority contends that several circumstances should have put the City of Chattanooga on notice that the rule was in a state of flux. The panel majority offers *no case law* authority indicating that the City of Chattanooga should have been put on notice that its practice was unconstitutional. The sole case that had cast doubt on the common law rule, adopted for more than a hundred years in Tennessee, had not only been vacated by the Supreme Court, but had been firmly repudiated by this Court in *Wiley.* It is immaterial that other states had chosen to abandon the common law rule in favor of the Model Penal Code approach. The panel majority fails to appreciate that this court and other courts had repeatedly concluded that a change from the longstanding common law rule was to be reserved for resolution by state legislatures rather than by court mandate.

To support the contention that the City of Chattanooga could have anticipated the *Garner II* decision, the majority relies on comments made in *Garner v. Memphis Police Dep't,* 600 F.2d 52 (6th Cir.1979) (hereinafter *Garner I*) in its remand to the district court. Focusing on Judge McCree's concurrences, the *Garner I* panel reasoned that the Tennessee statute in question had not been conclusively shown to be constitutional. 600 F.2d at 54. *Garner I,* however, did not dispute that prior cases found the statute to be in fact constitutional. *Garner I* did not address the viability of *Cunningham's* reasoning, which found the fleeing felon statute to be facially constitutional. The import of the *Garner I's* distinctions was thus equivocal and ambiguous at best. On remand the district court relied specifically on *Cunningham,* which had not been distinguished in *Garner I. Garner v. Memphis Police Dep't,* No. C–75–145, slip op. at 3–5, 11 (W.D.Tenn. Feb. 29, 1980); *see also id.,* slip op. at 8 (W.D.Tenn. July 8, 1981). *See*

*also Truss v. Collier*, 574 F.Supp. 1249, 1255–60 (S.D.Ohio 1983) (decided in the interim between *Garner I* and *Garner II*).

In *Truss* the district judge determined, despite his personal preference to abandon the fleeing felon rule, that he was compelled to uphold its validity in view of Sixth Circuit precedent. Upholding a similar Ohio statute, the *Truss* court remarked on comments made in *Garner I:*

> Given the above decisions by the Sixth Circuit, it would be unwarranted, as well as an abuse of the applicable authority, for this Court to conclude that the City of Springfield fleeing felon policy is unconstitutional. This is so, despite indications in later Sixth Circuit decisions that other panels of the Court might prefer a different result. *See, Garner v. Memphis Police Dep't*, 600 F.2d 52, 54–55 (6th Cir.1979) *(Garner )*, and *Haislah v. Walton*, 676 F.2d 208, 214, n. 3, and 215 n. 4 (6th Cir.1982)....

However much this Court might wish to interpret the relevant Sixth Circuit decisions in the manner suggested in *Garner*, such a conclusion would be impermissible, particularly with regard to the *Wiley* decision. As was previously noted, the plaintiff in *Wiley* did name the governmental entities such as the city and the police department as defendants, and did directly "challenge the deadly force policy of the City of Memphis, ... [claiming] that such policy was a violation of the constitutional rights of her decedent." *Wiley, supra*, 548 F.2d at 1248. Thus, it is impossible to conclude that the Sixth Circuit has not spoken on the issue of the constitutionality of the fleeing felon rule. Consequently, until such time as the Sixth Circuit sitting *en banc* overrules or discards the precedent in *Wiley*, this Court is bound to follow that decision. Accordingly, this Court must conclude, albeit with great reluctance, that the fleeing felon policy promulgated by the City of Springfield did not violate the constitutional rights of the Plaintiff, Mark Truss. Having reached this somewhat distressing, but necessary conclusion regarding the constitutionality

of the fleeing felon rule, the Court will next consider the qualified immunity defense of the Defendant, Paul Collier.

574 F.Supp. at 1260 (footnote omitted).

The question posed for remand in *Garner I* did not serve as notice to cities such as Chattanooga that the fleeing felon rule was constitutionally infirm. The question put on remand was: "[I]s a municipality's use of deadly force under Tennessee law to capture allegedly nondangerous felons fleeing from nonviolent crimes constitutionally permissible under the fourth, sixth, eighth and fourteenth amendments?" 600 F.2d at 55. *Garner I* did not discuss precedential decisions indicating that the rule was not constitutional; the court merely inserted a footnote citing various cases including the Second and Eighth Circuit cases previously discussed. Additionally the panel noted two law journal articles, one of which raised the fourth amendment as a possible basis for striking down the common law rule. *Id.* n. 2, 3; *see* Comment, *Deadly Force to Arrest: Triggering Constitutional Review*, 11 Harv. C.R.—C.L.L.Rev. 361 (1976). In light of cases reaching opposite conclusions on the constitutionality of the fleeing felon rule, and particularly in light of prior authority in this circuit, *Garner I's* formulation of the question on remand surely cannot be viewed as a foreshadowing of the rule's demise. To the contrary, *Garner I* gave the cities and their police departments no reasoned basis to conclude that prior decisions of this court were destined to be summarily overruled.

This conclusion is supported by two law review articles appearing after the Supreme Court decided *Garner II*. These articles determined after detailed research that the constitutional analysis in *Garner* was both novel and a clear break from past precedent.

The Supreme Court's affirmance in *Garner* represents an unexpected, but nonetheless logical, extension of existing fourth amendment jurisprudence. The decision was *unexpected* both because the Burger Court has generally curtailed

the scope of fourth amendment protections and because *the federal and state courts have been almost unanimous in upholding similar deadly force rules. The case also charted new territory* because the Court had never before held the means of arrest unreasonable when the officer had probable cause to believe the suspect had committed a crime. In addition, the Court for the first time explicitly recognized that the fourth amendment protects an individual's interest in life as well as her interests in property and privacy.

*The Supreme Court—Leading Cases,* 99 Harv.L.Rev. 120, 248 (1985) (emphasis added) (footnotes omitted). Similarly, a comment in The Cincinnati Law Review described *Garner II* as a "bold and pioneering step" and noted that prior to the 1983 Sixth Circuit ruling, "[e]xcept for one decision that was later vacated by the Supreme Court ... the federal courts consistently had declined to hold that the application of the fleeing felon doctrine resulted in unconstitutional deprivations." Comment, *Tennessee Code Section 40–7–108 Authorizing the Use of Deadly Force by Police Officers Against an Unarmed Suspect of a Nonviolent Felony Is Unconstitutional Under the Fourth and Fourteenth Amendments—Garner v. Memphis Police Department,* 710 F.2d 240 (6th Cir.1983), 52 U.Cin.L.Rev. 1154, 1159, 1167 (1983).

The panel majority's analysis of the threshold test under *Chevron Oil* fails to take into account a required focus on how the rulings in *Garner II* and *Tennessee v. Garner* differed and departed from prior court rulings. This court's determination that the fleeing felon rule was unconstitutional in *Garner II* under the fourth and fourteenth amendments constituted a novel approach that set forth a "new principle of law." To apply *Garner* retroactively is therefore unfair because the City of Chattanooga could not reasonably have anticipated in 1982 that the law might be struck down. The question is whether the ultimate holding in *Garner II* represented a clear break in precedent and whether the holding was reasonably anticipated by prior

precedent. Only by ignoring clear precedent and focusing on other states' legislative decisions to amend the common law rule could the City of Chattanooga have predicted that the longstanding fleeing felon rule would be suddenly deemed unconstitutional.

Until today courts have never suggested that the threshold *Chevron* test can be satisfied by showing that many state legislatures as a matter of policy had opted to revise a particular statute that was based on a long recognized common law principle, despite the absence of any viable judicial decision that had clearly found the common law rule to be unconstitutional. Rather, the Supreme Court has required the clear break to be determined from prior *case precedent.* When, as with *Garner,* a case "overturn[ed] a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved", the Supreme Court has determined that the threshold test has not been satisfied. *Johnson,* 457 U.S. at 551, 102 S.Ct. at 2587. The *Chevron* threshold, therefore, has not been satisfied in the instant case.

Next we must consider whether retroactive application of *Garner* would further or retard the operation of the Court's ruling. We make this determination " 'by looking to the prior history of the rule in question [and] its purpose and effect....' " *Chevron Oil,* 404 U.S. at 107, 92 S.Ct. at 355, quoting *Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965). The majority claims that retroactive application of *Garner* would further the decision's purpose—to compensate victims of unconstitutional police misconduct. The panel majority suggests, however, that compensation to the fleeing felon's family should be the sole focus when the opinion is forward-looking, seeking to deter officers from using deadly force. *See, e.g., Garner,* 105 S.Ct. at 1700–01; *Taylor v. Collins,* 574 F.Supp. 1554, 1558 (E.D.Mich. 1983); *see also Pembaur v. City of Cincinnati,* —— U.S. ——, 106 S.Ct. 1292, 1306, 89

L.Ed.2d 452 (1986) (Powell, J., dissenting) ("The primary reason for imposing § 1983 liability on local government units is deterence [sic], so that if there is any doubt about the constitutionality of their actions, officials will 'err on the side of protecting citizens' rights.' *Owen v. City of Independence*, 445 U.S. 622, 656, 100 S.Ct. 1398, 1418, 63 L.Ed.2d 673 (1980)"). Proof of improper use of deadly force may result in compensation to the decedent's estate, but this result is merely a collateral effect of applying the *Garner* rule. An award of damages against a police officer or a city may encourage future compliance with the rule, but its deterrent effect by retroactive application is highly questionable. Modifying one's behavior to comply with a future change of a rule, particularly an unforeseeable change, is difficult if not impossible. Retroactive application of *Garner* would, therefore, have little, if any, effect of furthering the deterrent goal of *Garner*.

Nor is the majority's balancing of the equities appropriate under the third prong of *Chevron Oil*. As the *Pembaur* dissent recently observed:

> [R]etroactive application ... in this context would produce substantial inequitable results by imposing liability on local government units for law enforcement practices that were legitimate at the time they were undertaken. See *Griffin v. Illinois*, 351 U.S. 12, 26, 76 S.Ct. 585, 594, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring in the judgment) ("We should not indulge in the fiction that the law now announced has always been the law...."). Civil liability

should not attach unless there was notice that a constitutional right was at risk. *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978).

*Pembaur*, 106 S.Ct. at 1306 (Powell, J., dissenting) (joined by Burger, C.J., and Rehnquist, J.). That reasoning applies with equal force in this case because the City of Chattanooga was justified in relying on the apparently established constitutionality of the Tennessee fleeing felon rule under Sixth Circuit rulings, a three-judge district court decision in the circuit, and the nearly unanimous judicial approval of the common law rule. To change the rule retroactively to the detriment of defendants and hundreds of other municipalities that would be adversely affected by such a ruling would be unfair.

The majority also found support for retroactive application in the fact that the *Garner* Court applied its ruling to the case before it. See *Smith v. General Motors Corp.*, 747 F.2d 372 (6th Cir.1984) (en banc). Our rationale in *Smith*, however, is inconsistent with the *Chevron* standards. This inconsistency is set out in the concurring and dissenting opinions in *Smith*, particularly in the opinions of Judges Merritt and Krupansky at pages 376 and 379. The simplistic analysis of retroactivity made in *Smith* was first adopted by the Second Circuit in *Welyczko v. U.S. Air, Inc.*, 733 F.2d 239 (2d Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984), but has subsequently been questioned by that court in *Byrne v. Buffalo Creek R.R.*, 765 F.2d 364 (1985)[2]. *Smith's* view of

---

**2.** At the same time, it is well recognized that, in the interest of justice, courts may exclude certain cases from the retroactive application of a judicial decision. See *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969). In determining whether to do that, they consider three factors: 1) whether the judicial decision establishes a new principal of law; 2) whether retroactive operation would advance or inhibit the new ruling's effect; and 3) whether retroactive operation "could produce substantial inequitable results." *See Chevron Oil Co. v. Hu-*

*son*, 404 U.S. 97, 106–09, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971) (quoting *Cipriano*, 395 U.S. at 706, 89 S.Ct. at 1900). Although we noted in *Welyczko* that the six-month statute of limitations for wrongful discharge and unfair representation cases ought to be applied retroactively without regard to the above three-factor analysis, neither that holding nor *DelCostello* [*v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983)] itself foreclosed the possibility of there ever being a case in which, because of special circum-

retroactivity would preclude meaningful and sensitive consideration and analysis of factors that may counsel against retroactive application as set out in *Chevron Oil.* I simply do not believe that the Supreme Court has decided that *Chevron* standards have been set aside whenever the Supreme Court applies an arguably new rule of law to the parties before it. See *Gurish v. McFaul*, 801 F.2d 225 (6th Cir.1986), wherein this court recognized that "federal courts generally have applied the three part test of *Chevron*" in determining whether a civil decision of the Supreme Court is to be applied retroactively, citing *Northern Pipeline Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 87–88, 92, 102 S.Ct. 2858, 2880, 2882, 73 L.Ed.2d 598 (1982), and other cases from this court.

Thus under the *Chevron Oil* analysis mandated by the Supreme Court, *Garner* should not be applied retroactively because of the City's justifiable reliance on the Tennessee statute, the negligible impact retroactive application would have on the *Garner* rule's purpose, and the great inequity municipalities would suffer if *Garner* is applied retroactively.

Finally, even if the panel majority's retroactivity analysis were correct, I disagree with the majority's conclusion that the district court erred in not granting a j.n.o.v. This conclusion fails to give the appropriate weight to the evidence from which the jury reached its decision. Reasonable minds could differ on whether deadly force could be constitutionally used against the decedent in this case. The shooting officer testified that after the window had been broken in the burglarized house, he observed that the fleeing decedent had an unknown object in his hand. Only after the shooting did the officer learn that the object was not a weapon. Moreover, police experience taught that many or most burglars are armed and dangerous.

Despite the panel majority's imposition of its own interpretation of the evidence, the jury inferred, after being given instructions in accordance with *Garner*'s guidelines, that the evidence supported a justifiable basis for use of deadly force under these circumstances. I cannot say as a matter of law that the evidence presented was inadequate to support the jury's decision. I therefore dissent also from that aspect of the majority's decision.

Officer Kyle was deemed to have acted in good faith. He believed that Carter was dangerous, did not know if he was armed, and realized that Carter was caught in the act of burglary and was reacting in desperation to those circumstances. The jury, therefore, construing the evidence most favorable to the City, might be allowed to find the City not liable even under *Garner* standards. The emphasis in *Garner*, as noted by the majority, was on the suspect's youth and the fact that he was unarmed. "[T]he armed burglar would present a different situation." 105 S.Ct. at 1706. Kyle himself felt that he had probable cause to believe Carter may have been armed. The police officer in such a situation should not be judged in light of hindsight when it was later discovered that Carter was unarmed.

I would affirm the decision of the district court.

---

stances, we would find that the retroactive application of the six-month statute of limitations would be appropriate.
*Bryne v. Buffalo Creek R.R.*, 765 F.2d 364, 366 (2d Cir.1985) (applying *Chevron Oil*). For a recent Second Circuit decision stating that *Chevron Oil* still governs retroactivity analysis in civil cases despite the fact that the Supreme Court applied the rule to the case before it, see *Gargiul v. Tompkins*, 790 F.2d 265, 274 (2d Cir.1986).

Since the Second Circuit's decision in *Welyczko* and the Sixth Circuit's holding in *Smith*, only one other court has addressed whether *DelCostello* was to be given retroactive effect. *Zemonick v. Consolidation Coal Co.*, 796 F.2d 1546 (4th Cir.1986).