Candi RYDER, Plaintiff/Appellant,

v.

The CITY OF TOPEKA and Michael Meyer, Defendants/Appellees.

No. 85–2042.

United States Court of Appeals, Tenth Circuit.

March 6, 1987.

Jerry K. Levy, Topeka, Kan. (Gerald L. Michaud of Michaud, Cordry, Michaud, Hutton & Hutton, Wichita, Kan., with him on the briefs), for plaintiff/appellant.

Wilburn Dillon, Jr., Topeka, Kan. (Richard L. Jones, Deputy City Atty., Topeka, Kan., with him on the briefs), for defendant/appellee, City of Topeka.

Mark L. Bennett, Jr., of Marshall, Davis, Bennett & Hendrix, Topeka, Kan., for defendant/appellee, Michael Meyer.

Before HOLLOWAY, Chief Judge, and ANDERSON, Circuit Judge, and CHILSON,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

This appeal is brought by plaintiff, Candi Ryder, from an adverse jury verdict finding that her constitutional rights were not violated when defendant, Topeka Police Detective Michael Meyer, shot her while she fled from the scene of a felony. Ryder raises three basic issues on appeal: first, whether the district court erred when it denied her motion for judgment notwithstanding the verdict; second, whether the misconduct of defendants' counsel in failing to timely produce a statement of Detective Meyer warrants reversal and remand for a new trial; and third, whether the district court improperly instructed the jury on the standard of probable cause.

For the reasons set forth below, we find that the trial court did not commit reversible error when it denied Ryder's motion for judgment notwithstanding the verdict. We further hold that the district court did not abuse its discretion when it concluded that counsel's failure to produce Detective Meyer's statement did not so prejudice Ryder as to justify a new trial. We do, however,

* The Honorable O. Hatfield Chilson, District Judge for the District of Colorado, sitting by designation.

remand this case to the district court to determine whether counsel's failure to produce the statement warrants disciplinary action. Finally, we do not reach the merits of whether the trial court improperly instructed the jury on the definition of probable cause since Ryder failed to preserve that issue by timely objection at trial. Therefore, we affirm the jury verdict in all respects but remand to the district court for a factual finding on whether sanctions or disciplinary action should be instigated against defendants' counsel for failure to comply with discovery rules.

## I.

### BACKGROUND

This action arises from the shooting of Ryder while she was fleeing from the commission of a felony. The crux of this case is whether Detective Meyer had probable cause to assume that Ryder had been involved in the commission of a crime involving the infliction or threatened infliction of serious bodily injury, or that she posed a threat of serious physical harm, either to Detective Meyer or others, and that the use of deadly force was necessary to prevent her escape. *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

The facts in this case are involved and in dispute. During March of 1979, Candi Ryder, a fourteen year old runaway, and a man named Jim Callender discussed the idea of stealing money from the Pizza Hut restaurant where Callender worked.[1] At that time, both Ryder and Callender were living in a half-way house located approximately two blocks from the Pizza Hut. R.Vol. VIII at 1496. Sometime thereafter,

Callender told another employee of the Pizza Hut, Frank Bently, that he had been involved in a plan to steal money from the Pizza Hut but now wanted to back out. The two approached the Pizza Hut area supervisor and informed him of Callender's involvement with the plan. R.Vol. VI at 596–97. The area supervisor visited the Topeka Police Department and informed Detectives Meyer and Brooks that there was to be a "robbery" of his Pizza Hut on West Sixth. *Id.* at 466–68, 605. The detectives requested that he have Callender and Bently come to the station. *Id.* at 469.

On March 15, 1979, Callender went to the police station and informed Detectives Meyer and Brooks of his discussions with Ryder. *Id.* at 337–38. The parties dispute what Callender actually told the police about Ryder and the other individuals who were involved in the scheme. Defendants suggest that Callender only informed the detectives that a person "by the name of 'Candi' had approached him to work as the inside man on a robbery." *Id.* at 471. They suggest that Callender produced neither information regarding Ryder's name, address and age, *id.* at 476, nor information about any other people who were to be involved in the commission of the crime,[2] *id.* at 142, 338–39, 471–75.

Ryder paints a different picture of events.[3] She suggests that Callender informed the detectives of her last name, her address, and the fact that she was a juvenile. Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–6 to A–7. Ryder further suggests that Detective Meyer was aware of the names of two

---

**1.** The parties dispute which person initiated the discussions. Ryder testified that Callender informed her that there was a large amount of money kept in the restaurant, and that if she would come into the store and rob it, they could later split the money. R.Vol. VIII at 1500–03. There was other testimony, however, that, although originally involved in the plan, "he [Callender] didn't want to follow through" and "was unsuccessful in being able to persuade those people not to continue to do it." R.Vol. VI at 597.

**2.** Detective Brooks testified that he asked Callender "[h]ow old [Candi] is, where she lives, and her associates' names and addresses and

ages." R.Vol. VI at 477. Callender responded, according to Brooks, that he "didn't have that information at that time." *Id.*

**3.** Ryder's counsel bases his version of the meeting on a statement given by Detective Meyer on May 5, 1981, to Sergeant Dave McClimans of the Topeka Police Department. Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–3 to A–25. Defendants did not produce this statement during the discovery process or at trial until Ryder's counsel inadvertently found out about the existence of the statement during the testimony of an expert witness who had been provided with the document by defendants' counsel.

males in Ryder's group and that one of these was a juvenile. *Id.* at A–12.

It is undisputed that Callender informed the detectives that the group would be armed with knives and guns. R.Vol. VI at 338–39, 479; R.Vol. II at 34.

Sometime later Callender told the police that the "robbery" would take place Sunday, March 25, 1979, at 11:30 p.m. R.Vol. VI at 154.[4] On that date, several Topeka Police officers, three members of the tactical squad, and Detectives Meyer, Brooks, and Starr met to set up the stake-out. Callender and Bently were present at the Pizza Hut and were to carry out the plan as established between Ryder and Callender. Detectives Brooks, Starr and Meyer positioned themselves in the garage directly south of the Pizza Hut. *Id.* at 157, 347. Officer Beach was stationed in the restroom of the Pizza Hut. *Id.* at 155, 350. Officer Sandberg was stationed to the east of the Pizza Hut, Officer Lemon to the north, Officer Weidner was in an unmarked car to the west, Officers Schwerdt and Reed were positioned in unmarked cars to the east and south, and a helicopter unit was made available. *Id.* at 156–57.

At approximately 10:00 p.m., after the stake-out had been set-up, two girls, Leslie Jester and Ann Martin, stopped by the Pizza Hut and informed Callender that they had decided to "break off" from "Candi's group," and rob the restaurant before her. At 11:00 p.m., the two girls phoned Callender, informing him that they were on their way. Officer Beach radioed the other officers that two girls were on their way and that a second group would come around 11:30 p.m. R.Vol. VII at 768–69. Shortly thereafter, the two girls walked by the garage in the alley where the three detectives were stationed and went into the Pizza Hut through the back door. R. Vol. VI at 496 to 97–a. After they went inside, the three detectives moved up behind some dumpsters. *Id.* at 497–a.

As the girls exited the Pizza Hut, the detectives observed a knife in the hands of one of the suspects.[5] *Id.* at 359. The three detectives yelled, "Halt, police," and approached the suspects with their guns drawn. While the officers were apprehending the suspects, one of the suspects "took a swipe with a knife." *Id.* at 359–60; R.Vol. VIII at 1687. Ryder claims that, while being handcuffed, Leslie Jester saw Callender come to the back door of the Pizza Hut and tell the officers to "hurry up and get them out of here. Candi Ryder is on her way." R.Vol. VIII at 1691. The two girls were transported to police headquarters in a marked police vehicle driven by Officer Reed. *Id.* at 1653–54.[6] The stake-out was then set up again. R.Vol. VI at 362–63.

At approximately 11:20 p.m., Callender received another telephone call informing him that a second group was on its way to the Pizza Hut and that its members would be armed. R.Vol. VII at 783–84. Callender relayed this information to Officer Beach who was still stationed inside the Pizza Hut.

At approximately 11:30 p.m., three people walked across the parking lot to the rear door of the Pizza Hut. The detectives could not tell whether or not they were armed. R.Vol. VI at 368; R.Vol. VII at 1388. Two of the individuals went inside the Pizza Hut and the taller of the three remained outside. Because of the lookout, the detectives could not move closer to the Pizza Hut as they had done previously. At one point after the suspects had entered the restaurant, the back door was opened and something was handed out to the lookout. R.Vol. VI at 369, 514–15.

A short time later the two suspects who had been inside the restaurant came out the back door. At that moment, the detectives ran out from behind the garage with their handguns drawn and yelled, "Halt, police." *Id.* at 370, 518. Two of the sus-

---

4. Ryder alleges that Detective Meyer had Callender call her and tell her to go ahead with the robbery. Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–5.

5. Ryder contends that either Bently or Callender gave the girls a butcher knife as they were

leaving the restaurant in order to make the robbery look real. R.Vol. VIII at 1684–85.

6. During the process of arresting the two, a car pulled into the parking lot, was stopped by the police, and the driver taken to police headquarters. R.Vol. VI at 559–60.

pects commenced running north, immediately pursued by Detectives Brooks and Starr. The third suspect, Ryder, ran east and was pursued by Detective Meyer. *Id.* at 370–71, 518–19. As he began his pursuit, Detective Meyer was unaware of the suspect's name, sex, or age. *Id.* at 370–71. After chasing the suspect for a short time, Detective Meyer fired a warning shot. The suspect continued to run. She was over fifty feet from Detective Meyer, and about to run around a building into a darkened residential area, when Detective Meyer fired a second shot. *Id.* at 236, 373, 375–76. The second shot struck the suspect and she fell to the ground. Detective Meyer approached the fallen suspect,[7] noticed that she was a young girl, and called for an ambulance.[8]

Ryder subsequently filed this action against the City of Topeka, Kansas, and Detective Meyer, claiming her Fourth Amendment right to be free from unlawful search and seizure had been violated by Detective Meyer's use of deadly force.[9] The trial began on April 13, 1985, and lasted four weeks. During the trial, Ryder became aware of the existence of a statement previously given by Detective Meyer to police investigator Sergeant Dave McClimans. The statement, which Ryder contends contradicts defendants' version of events, was not discovered by Ryder's counsel until near the end of trial during cross-examination of an expert witness to whom the defendants had given the documents. At the behest of the trial court, the defendants produced the statement on May 6, 1985, some five years after discovery, twenty-two days after trial had commenced, and after Ryder had rested her case. Ryder's counsel introduced the statement into evidence, cross-examined one of the defendants' experts for over one and one-half days and argued the statement's contents to the jury. Ryder's counsel did not, however, recall Detective Meyer to the stand to confront him with his conflicting statements.

The trial was completed on May 9, 1985, and on May 13, 1985, the jury returned a verdict for defendants, finding that Ryder's constitutional rights were not violated when she was shot by Detective Meyer. Thereafter, Ryder filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The district court denied both motions and Ryder timely appealed.

## II.

## SUFFICIENCY OF THE EVIDENCE

### A. *Legal Standard*

The Fourth Amendment protects citizens from unreasonable search and seizure.[10] "While it is not always clear just when minimal police interference becomes a seizure ... there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."[11]

---

**7.** Over $1,700.00 was found in the suspect's possession.

**8.** As a result of the shooting, Ryder was rendered a quadraplegic.

**9.** The right to use deadly force has been frequently discussed in the legal literature. *See generally,* R. Perkins & R. Boyce, *Criminal Law,* at 1104 (3rd ed. 1982) (citing Sherman, *Execution Without Trial: Police Homicide and the Constitution,* 33 Vand.L.Rev. 71 (1980); Mogin, *The Policeman's Privilege to Shoot a Fleeing Suspect: Constitutional Limits on the Use of Deadly Force,* 18 Am.Crim.L.Rev. 533 (1981); Comment, *Use of Deadly Force in the Arrest Process,* 31 La.L.Rev. 131 (1970); Comment, *Deadly Force to Arrest: Triggering Constitutional Review,* 11 Harv.C.R.–C.L.L.Rev. 361 (1976)).

**10.** "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

**11.** We note that the use of deadly force does not occur only when the suspect actually dies. *See Pruitt v. City of Montgomery,* 771 F.2d 1475, 1479 (11th Cir.1985); *Acoff v. Abston,* 762 F.2d 1543 (11th Cir.1985). Several courts of appeals have adopted the Model Penal Code definition of deadly force. *Pruitt,* 771 F.2d at 1479 n. 10; *Mattis v. Schnarr,* 547 F.2d 1007, 1009 n. 2 (8th Cir.1976) (en banc), *vacated as moot sub nom. Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1972). The Model Penal Code defines "deadly force" as:

force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force.

*Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (citations omitted).[12] Whether a particular "seizure was reasonable and therefore permitted by the Fourth Amendment requires a careful balancing of the important public interest in crime prevention and detection and the nature and quality of the intrusion upon legitimate interests of the individual." *Id.* at 25–26, 105 S.Ct. at 1708 (O'Connor, J., dissenting) (citing *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). "[I]t is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." *Id.* at 8, 105 S.Ct. at 1699 (citing *United States v. Ortiz,* 422 U.S. 891, 895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975);

Model Penal Code § 3.11(2) (1985); *see also* Comment, *Deadly Force to Arrest: Triggering Constitutional Review,* 11 Harv.C.R.–C.L.L.Rev. 361, 363 (1976) (describing deadly force as "such force as under normal circumstances poses a high risk of death or serious injury to its human target, regardless of whether or not death, serious injury or any harm actually results in a given case"). We find that the actions of Detective Meyer clearly constitute the "use of deadly force" in the constitutional sense.

**12.** In *Garner,* the Court considered the constitutional validity of a Tennessee "fleeing felon" statute which allowed a police officer to "use all the necessary means to effect the arrest" if the suspect flees or forcibly resists arrest. Tenn. Code Ann. § 40–7–108 (1982). In *Garner,* a Memphis police officer shot and killed an unarmed, fleeing burglary suspect in order to apprehend him. The suspect was fifteen years old, 5′ 4″ tall, and weighed approximately 100 pounds.

**13.** *Garner* altered the common law rule which allowed the use of deadly force to apprehend a fleeing felon, a privilege which extended to a private person as well as a police officer. *See generally* R. Perkins & R. Boyce, *supra* note 9, at 1099. Prior to *Garner,* state jurisdictions varied in the authority of a police officer to use deadly force in apprehending a fleeing felony suspect. As summarized by the Supreme Court in *Garner:*

Some 19 States have codified the common-law rule, though in two of these the courts have significantly limited the statute. Four States, though without a relevant statute, apparently retain the common-law rule. Two states have adopted the Model Penal Code's provision verbatim. Eighteen others allow, in slightly varying language, the use of deadly force only if the suspect has committed a felony involving the use or threat of physical or deadly force, or is escaping with a deadly weapon, or is likely to endanger life or inflict serious

*Terry v. Ohio,* 392 U.S. 1, 28–29, 88 S.Ct. 1868, 1883–84, 20 L.Ed.2d 889 (1968)).

In reviewing Detective Meyer's actions, we start with the premise that the "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.... Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."[13] *Id.* at 11, 105 S.Ct. at 1701. "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.*

In limited circumstances, however, the use of deadly force to apprehend a fleeing felon is constitutionally permissible.[14] As

physical injury if not arrested. Louisiana and Vermont, though without statutes or case law on point, do forbid the use of deadly force to prevent any but violent felonies. The remaining States either have no relevant statute or case-law, or have positions that are unclear. *Garner,* 471 U.S. at 16–17, 105 S.Ct. at 1703 (footnotes omitted).

Kansas has codified the right of an officer to use deadly force as follows:

(1) A law enforcement officer ... is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or another person, or when he reasonably believes that such force is necessary to prevent the arrest from being defeated by resistance or escape and the person to be arrested has committed or attempted to commit a felony or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

Kan.Stat.Ann. § 21–3215 (1981). As the validity of this statute has not been put into question, we make no statement regarding its constitutionality. Of course, all statutes authorizing the use of deadly force will be measured against the standards set forth in *Garner.*

**14.** Most American jurisdictions impose a prohibition against the use of deadly force to stop a fleeing misdemeanant. *Garner,* 471 U.S. at 12, 105 S.Ct. at 1701 (citing *Holloway v. Moser,* 193 N.C. 185, 136 S.E. 375 (1927); *State v. Smith,* 127 Iowa 534, 535, 103 N.W. 944, 945 (1905); *Reneau v. State,* 70 Tenn. 720 (1879); *Brooks v.*

the Supreme Court in *Garner* has pronounced:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.*

## B. *Judgment N.O.V.*

Ryder first alleges that the district court committed reversible error when it denied her motion for judgment n.o.v. We note that in reviewing that decision, we employ the same standard of review as does the trial court. *Brown v. McGraw-Edison Co.,* 736 F.2d 609, 613 (10th Cir.1984); *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 680 (10th Cir.1981). "Judgment n.o.v. is proper only when the evidence so strongly supports an issue that reasonable minds could not differ." *Delano v. Kitch,* 663 F.2d 990, 1002 (10th Cir.1981) (citing *Symons v. Mueller Co.,* 493 F.2d 972, 976 (10th Cir. 1974); *Swearngin v. Sears Roebuck & Co.,* 376 F.2d 637, 639 (10th Cir.1967)); *see also Carter v. City of Chattanooga,* 803 F.2d 217 (6th Cir.1986). We must view the evidence in the light most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence. *Brown,* 736 F.2d at 613; *see also Martin v. Unit Rig & Equip. Co.,* 715 F.2d 1434, 1438 (10th Cir.1983). A reviewing court "is

not permitted to consider the credibility of witnesses in reaching its decision ... nor may a court weigh the evidence or determine where the preponderance of the evidence lies." *Martin,* 715 F.2d at 1438 (citing *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); *Wylie v. Ford Motor Co.,* 502 F.2d 1292, 1294 (10th Cir.1974)). Moreover, if there is conflicting or insufficient evidence to warrant a "one-way conclusion," a directed verdict or judgment n.o.v. is inappropriate. *Id.* Generally, a directed verdict or a motion for a judgment n.o.v. "should be cautiously and sparingly granted." *Id.* (quoting *Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabricating, Inc.,* 584 F.2d 946, 951 (10th Cir.1978)); *see also Selle v. Gibb,* 741 F.2d 896 (7th Cir.1984).

We now examine whether, under the above standard, the district court abused its discretion in denying Ryder's motion for judgment n.o.v. To do so, we must examine whether there is evidence in the record to support the jury's conclusion on the three basic elements of *Garner:* (1) whether Detective Meyer had probable cause to believe that the suspect he was pursuing posed a threat of serious physical harm to himself or others; (2) whether the deadly force employed by Detective Meyer was necessary to prevent the suspect's escape; and (3) whether Detective Meyer gave some warning, if feasible, to the suspect.[15] *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701; *see also Pruitt v. City of Montgomery,* 771 F.2d 1475, 1482–83 (11th Cir.1985); *Acoff v. Abston,* 762 F.2d 1543, 1547 (11th Cir.1985).

### 1. *Threat of Serious Physical Harm*

■ We first discuss whether Detective Meyer had probable cause to believe that the suspect posed a threat of serious physical harm to himself or others. The Supreme Court has suggested that proba-

---

*Commonwealth,* 61 Pa. 352 (1869); *Roberts v. State,* 14 Mo. 138 (1851); *see generally* R. Perkins & R. Boyce, *Criminal Law* 1098–1102 (3d ed. 1982); Day, *Shooting the Fleeing Felon: State of the Law,* 14 Crim.L.Bull. 285, 286–87 (1978); Wilgus, *Arrest Without a Warrant,* 22 Mich.L. Rev. 798, 807–816 (1924). *But see Storey v. State,* 71 Ala. 329 (1882); *State v. Bryant,* 65 N.C. 327, 328 (1871); *Caldwell v. State,* 41 Tex. 86 (1874)).

**15.** We need not address this issue as Ryder has not raised it on appeal. We note, however, that

it is undisputed that the officers informed the suspects that they were police officers and ordered them to halt. R.Vol. VI at 370, 518. Moreover, though in violation of local police policy, Detective Meyer fired a warning shot prior to firing at the suspect.

In *Acoff,* the Eleventh Circuit held that "the officer must give some warning regarding the possible use of deadly force." *Garner* refers only to "some warning." 471 U.S. at 11, 105 S.Ct. at 1701. We decline to decide what warning would be sufficient.

ble cause of this sort exists where "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm ...." *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701. Thus, there are two basic situations that would justify an officer's belief that a fleeing suspect poses a threat of serious physical harm: (1) where the suspect has placed the officer in a dangerous, life threatening situation;[16] or (2) where the suspect is fleeing from the commission of an inherently violent crime. This latter situation does not require that the officer's life actually be threatened by the suspect. Rather, the officer is allowed to infer that the suspect is inherently dangerous by the violent nature of the crime.

### a. *Crime involving the infliction of serious physical harm.*

We will first examine defendants' contention that Detective Meyer had probable cause to believe that Ryder was fleeing from the commission of a crime that involved the infliction or threatened infliction of serious bodily harm. Throughout their briefs, defendants attempt to frame the incidents occurring at the Pizza Hut on March 25, 1979, as an armed robbery. They argue that Detective Meyer was "provided information by Rick Gledhill, James Callender, and Frank Bently that an *armed robbery* of the Pizza Hut on West 6th Street in Topeka was planned." Joint Brief of Defendants/Appellees at 15 (emphasis added). They allege that the "stake-out was planned on the premise that an armed robbery would occur" and that "after the stake-out was in place, the police officers were informed two robberies would occur instead of one." *Id.* Defendants thus claim that Detective Meyer had probable cause to believe that Ryder was involved in an armed robbery,[17] or other violent felony.

We disagree.

■ Contrary to defendants' argument, the evidence strongly points to Detective

16. The Eleventh Circuit has suggested that under *Garner,* "probable cause to believe that the suspect poses a serious physical threat to the person of the police officer exists *only* where the officer is threatened with a *weapon.*" *Pruitt,* 771 F.2d at 1483 n. 14 (citing *Acoff,* 762 F.2d at 1547) (second emphasis added). We disagree. Presumably, the Eleventh Circuit bases its conjecture on the statement in *Garner* that, "if the suspect threatens the officer with a weapon ..., deadly force may be used...." *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701. We feel a more logical construction is that the Supreme Court utilized the above quoted phrase merely as an example, and not a limitation, on the type of circumstances that would justify an officer's belief that the suspect was threatening immediate harm. Indeed, the phrase modifies the general pronouncement that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*

We believe that the Eleventh Circuit's construction is too limited. There might be numerous situations that would justify a police officer's belief that a suspect was armed and that he posed an immediate threat to the officer, even though the suspect was not in fact armed. Certainly, whether a suspect is armed is a relevant factor in determining whether the suspect poses an immediate danger. A per se rule, however, that a police officer may never employ deadly force unless attacked by a suspect possessing a deadly weapon would place a police officer in a dangerous and unreasonable situation. Therefore, we conclude that whether a particular seizure is reasonable is dependent on the "totality of the circumstances," *id.* at 9, 105 S.Ct. at 1700, and not simply on whether the suspect was actually armed. *See Carter v. City of Chattanooga,* 803 F.2d 217 (6th Cir.1986). We do not reach the question of whether a police officer may employ deadly force if he knows that the suspect is not armed but is potentially dangerous.

17. We do not doubt that the Supreme Court would consider an aggravated armed robbery to be a "crime involving the infliction of serious physical harm." For centuries, the rule followed in both England and the United States has been that the crime of robbery involves the taking of property by means of force or violence or by putting the victim in fear of suffering serious physical harm. As Blackstone has stated, "the taking must be by force, or a previous putting in fear, which makes the violation of the person more atrocious than privately stealing." 4 Bl.Comm. 243. Kansas has two robbery statutes:

  21-3426. Robbery. Robbery is the taking of property from the person or presence of another by threat of bodily harm to his person or the person of another or by force.

  21-3427. Aggravated robbery. Aggravated robbery is a robbery committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery.

  Kan.Stat.Ann. §§ 21-3426, 21-3427 (1981).

Meyer's awareness of the non-violent, consensual nature of the crime. At their first meeting, Callender informed Detective Meyer that he had agreed with Ryder to act as an inside man. R.Vol. VI at 471. Callender was to leave the door open for Ryder, hand her the money, and at a later date, meet her to divide the stolen money. *Id.* at 479, 597; R.Vol. VIII at 1500–03. At no time was Detective Meyer, or any of the other officers, led to believe that force or violence would be used to obtain the money from Callender. At most, Detective Meyer had reasonable grounds to believe that Ryder and other members of her group were participating in a fraudulent theft.[18] Theft, however, unlike robbery, is a crime against property. *State v. Gomes,* 234 Kan. 447, 673 P.2d 1160, 1163 (1983). As such, theft lacks the threat of bodily harm or force that makes robbery such an inherently dangerous and violent crime.[19] Under the circumstances, there is simply insufficient evidence to support a jury finding that such a consensual, non-violent crime involved "the infliction or threatened infliction of serious physical harm." *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701.

Moreover, we are unpersuaded by the argument that simply because Detective Meyer had probable cause to assume that the suspects might be armed, he could reasonably infer that the crime involved the infliction or threatened infliction of serious bodily injury. Certainly, a police officer's knowledge that a suspect is in possession of a dangerous weapon is a relevant and persuasive factor in determining whether the crime involved force or violence. In this case, however, we feel that Detective Meyer's knowledge that the suspects might be armed was insufficient, by itself, to overcome the overwhelming evidence that the crime was intended to be, and was, a non-violent one. Detective Meyer, and the other officers, were presented with no demonstrable evidence that would justify the belief that Ryder, or other members of her group, used, or would have used, force to facilitate the commission of the crime.

b. *Evidence to support the jury's verdict that Detective Meyer had probable cause to believe that the suspect he was pursuing posed a threat of serious physical harm.*

Our inquiry does not, however, end with the question of whether the crime at issue was violent or non-violent. Although a crime may not be so inherently dangerous

**18.** Kansas statutes define theft as follows:
21–3701. Theft. Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property:

(a) Obtaining or exerting unauthorized control over property; or
(b) Obtaining by deception control over property; or
(c) Obtaining by threat control over property; or
(d) Obtaining control over stolen property knowing the property to have been stolen by another.

Theft of property of the value of $150 or more is a class E felony. Theft of property the value of less than $150 is a class A misdemeanor....
Kan.Stat.Ann. § 21–3701 (supp.1985).

**19.** We do not mean to say, however, that the crime of theft is always a non-violent crime. Indeed, we note that the Kansas Supreme Court has held that at least two felonies delineated in the Kansas theft statutes, "when viewed in the

abstract [are] inherently dangerous to human life ... [and may thus] sustain a conviction for murder in the first degree under the felony murder rule." *State v. Lashley,* 233 Kan. 620, 664 P.2d 1358, 1370 (1983). The Kansas Supreme Court held that:

K.S.A. 21–3701 incorporates two sections that are, when viewed in the abstract, offenses that are inherently dangerous to human life: (1) theft by obtaining or exerting unauthorized control over property—K.S.A. 21–3701(a); and (2) theft by obtaining control over property by threat—K.S.A. 21–3701(c).

*Id.* The court held, however, that the following theft crimes are not inherently dangerous to human life:

(1) theft of lost or mislaid property—K.S.A. 21–3703;
(2) unlawful deprivation of property—K.S.A. 21–3705;
(3) theft, obtaining by deception control over property—K.S.A. 21–3701(b); and (4) theft by control over stolen property knowing the property to have been stolen by another—K.S.A. 21–3701(d).
*Id.*

as to automatically justify an officer's use of deadly force in apprehending a fleeing suspect, there may nonetheless be other facts that would provide the officer with probable cause to believe that a fleeing suspect presents a danger to himself or the community. This brings us to our second inquiry: whether, based on the totality of the circumstances, Detective Meyer was reasonably justified in believing that the suspect he was chasing down the alley posed a threat of serious physical harm to himself or others.

After carefully reviewing the record, we cannot say with certainty that the jury was not justified in finding that Detective Meyer had probable cause to believe that Ryder posed a threat of physical violence to himself or others. We note that the evidence is conflicting, and that the credibility of nearly every witness has been placed in issue. However, "[j]ury findings on sharply conflicting evidence are conclusively binding on appeal inasmuch as jurors are charged with the exclusive duty of assessing the credibility of witnesses and determining the weight to be given to their testimony." *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983) (citing *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978)).

The overwhelming evidence presented at trial was that the suspects would be armed. Detective Meyer and Detective Brooks both testified that at their first meeting with Callender, he informed them that the group would be armed with guns and knives. R.Vol. VI at 338, 479.[20] Callender also received a phone call just minutes before the second group of suspects arrived at the Pizza Hut, informing him that they would be armed. Callender relayed this information to Officer Beach who was stationed in the Pizza Hut restroom.[21] R.Vol. VII at 783–84. There was even evidence that one of the girls in the first group, Leslie Jester, and one of the men in Ryder's group, Scott Wertzberger, thought that a gun and knife might be involved in the commission of the crime. R.Vol. VIII 1672–74, 1720–21. Moreover, it is undisputed that when the detectives were apprehending Leslie Jester and Ann Martin after they fled the Pizza Hut, one of them "took a swipe with the knife". R.Vol. VI at 359–60; R.Vol. VIII at 1687.[22]

From this information, a jury could infer that Detective Meyer had probable cause to believe that the suspect he was chasing down the darkened alley was both armed and prone to violence. Moreover, at the time he fired the second shot, the suspect's hands were in her pockets, R.Vol. VI at 399–400, and she was about to run around a building into a darkened residential area.

---

**20.** Callender's deposition also confirms that Detective Meyer was informed that the group would be carrying guns or knives. Callender stated in his deposition:

Q. Did you tell them it was going to be an armed robbery?
A. They wanted to know if there would be any guns and then call before they came. I said, they would be carrying knives and guns. R.Vol. II at 34.

**21.** We note that when Officer Beach radioed to the other officers that the second group was on its way, he did not state that members of the second group would be armed. R.Vol. VII at 783. Explaining why he did not, Officer Beach testified:

Q. The second phone call that Mr. Callender got, he told you specifically this other group was on its way down, and he thought they would be packing?
A. That's correct.
Q. What does the work [sic] packing mean?

A. Armed, carrying a weapon.
Q. Why didn't you put out the word they would be packing when you transmitted that?
A. We thought this was going to be an armed robbery; that is the way we understood it. Armed robbery, people are armed.
Q. So adding the word packing to your transmission wouldn't add anything to what you already thought?
A. No, we were expecting them to be armed. *Id.* at 784.

**22.** There is a dispute as to whether the girls picked up the knives themselves or whether Frank Bently handed the knives to the girls in order to make the crime look real. *See, e.g.,* R.Vol. VIII at 1684–85; R.Vol. III at 37, 45–46; R.Vol. II at 46–47. Regardless of the manner in which the knife came into the suspect's possession, seeing the suspect with a knife fleeing from the scene would certainly support a jury's finding that Detective Meyer had probable cause to assume that all suspects were armed.

*Id.* at 375–76. At that moment, the jury reasonably could infer that an ambush situation was created in which Detective Meyer's life was in danger. Detective Meyer testified to this effect at trial. He testified that he believed the suspect posed a threat of physical harm to himself, and that if he continued to pursue the suspect around the side of the building, his life would be in danger. *Id.* at 376, 379. Two expert witnesses, Donald O. Shultz and Dr. Erik Beckman, also testified that, at the time of the shooting, Detective Meyer had probable cause to believe that the suspect he was chasing posed a threat of serious injury if he continued his pursuit. We therefore conclude that there was sufficient evidence from which the jury could infer that the suspect Detective Meyer was pursuing down the darkened alley posed a threat of physical violence to himself, or a threat to others. *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701. Accordingly, we cannot conclude that the district court abused its discretion when it denied Ryder's motion for judgment n.o.v.

■ Ryder contends, however, that Detective Meyer knew Ryder was a fourteen year old girl and therefore should have known that she presented him no danger. We are unpersuaded by this argument. Even assuming that Detective Meyer knew Ryder was a juvenile, there is no causal link suggesting that he should have known that the suspect he was pursuing down the alley was, in fact, Ryder. To the contrary, the evidence suggests that Detective Meyer was unaware of the name, age or sex of the suspect he was pursuing. R.Vol. VI at 371, 378; Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–14. Indeed, there is evidence suggesting that Detective Meyer believed that Ryder was one of the girls already taken into custody. Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–14.

Finally, we note that *Garner* [23] is distinguishable from the present situation.[24]

---

**23.** In *Garner,* police officers were dispatched to answer a "prowler inside call." When they arrived at the scene, the officers saw a woman on her front porch gesturing toward the adjacent house. She told the officers that she had heard glass breaking and that " 'someone' was breaking in next door." 471 U.S. at 3, 105 S.Ct. at 1697. One of the police officers went behind the house where he "heard a door slam and saw someone run across the backyard." *Id.* The fleeing suspect stopped when he reached a 6-foot chain link fence at the edge of the backyard. By using a flashlight the officer could see the face and hands of the suspect. The officer saw no weapon, and thought that the suspect was unarmed. He thought that the suspect was 17 or 18 years old and about 5′5″ or 5′7″ tall. "In fact, Garner, an eighth-grader, was 15. He was 5′ 4″ tall and weighed somewhere around 100 or 110 pounds." *Id.* at 4 n. 2, 105 S.Ct. at 1697 n. 2.

While the suspect crouched at the base of the fence, the police officer called out "police, halt" and took a few steps toward him. When the suspect began to climb over the fence, the police officer shot him. The suspect died from a bullet wound in the back of the head. *Id.* at 4, 105 S.Ct. at 1697.

**24.** We also find the present situation distinguishable from *Pruitt v. City of Montgomery,* 771 F.2d 1475 (11th Cir.1985) and from *Carter v. City of Chattanooga,* 803 F.2d 217 (6th Cir.1986). *Pruitt* involved the shooting of an unarmed eighteen year old who was fleeing from the scene of a commercial burglary. As the police officer approached the rear of the store, the plaintiff burglar came out from behind some bushes and approached or "came at" the officer. The suspect began to run away from the back of the store through some woods. The police officer yelled "halt, police," and fired his shotgun twice at the plaintiff, permanently paralyzing him.

The police officer attempted to justify the shooting by stating that he was momentarily placed in fear by the plaintiff's emergence from the bushes. The officer stated that he thought the plaintiff was trying to hit him or knock him down. The court rejected the police officer's argument, concluding that even if the officer was momentarily placed in fear, that fear had passed when the plaintiff commenced running away through the woods. The court also pointed to testimony from the officer that at the time of the shooting, he believed that the suspect posed no threat to himself or other innocent bystanders. Moreover, the police officer had no reason to think that the plaintiff was armed. 771 F.2d at 1482–84.

Similarly, *Carter* is distinguishable on its facts. In *Carter,* the plaintiff's son was shot and killed while fleeing the scene of a daytime residential burglary. The police officer had seen the suspect jump off the porch of the house and begin "running in a crouched position away from the house with an object in his right hand, which Lt. Kyle [the police officer] could not identify." 803 F.2d at 218. When the suspect did not stop despite the police officer's two warnings, the officer shot him "from some 45 to 55 feet away." *Id.* It later turned out that the object in the suspect's right hand was a washcloth.

Similarly, both cases involved minors fleeing from non-inherently dangerous felonies. In *Garner*, however, the defendant police officer clearly saw that the suspect had no gun and he was "reasonably sure" and "figured" that the suspect was unarmed. *Garner*, 471 U.S. at 3, 105 S.Ct. at 1697. Nor was the officer presented with any evidence suggesting the suspect was violent. In the present situation, however, there was evidence to justify Detective Meyer's belief that the suspect he was pursuing down the darkened alley was indeed armed and dangerous, and that at the time of the shooting, he was in immediate fear of bodily injury.

## 2. *Necessity of Deadly Force to Prevent Escape*

We now turn to the question of whether there was evidence to support the jury's finding that, absent the use of deadly force, the suspect would have escaped. Once again, the evidence is conflicting. Ryder claims that there were several alternative methods of apprehending her other than by the use of deadly force. Ryder suggests that Detective Meyer could have continued to try and catch her on foot or enlisted the assistance of other officers in the area.

Detective Meyer, however, testified that it was unreasonable to continue to pursue the suspect around the side of the building into a darkened area because he believed the suspect was armed and his life would be in danger. R.Vol. VI at 379, 412–13. He testified that once he lost sight of the suspect, who was heading into a darkened residential area, escape was likely. *Id.* at 375–76. Detective Meyer also testified that it was not reasonable to rely on other officers who were stationed in the vicinity, but approximately two blocks away, to capture the suspect since he did not know which way the suspect would run after rounding the building. *Id.* at 379–80.

Moreover, defendants' two expert witnesses supported the reasonableness of Detective Meyer's assumptions. Donald Schultz testified:

Q. Was it reasonable in this instance, Mr. Schultz, to allow the suspect to escape with the thought that other officers in the area in vehicles might capture that person?

A. It is not reasonable in that vehicles are there to catch vehicles. An officer pulling up to an individual running that would have to stop his vehicle, get out, usually make radio contact. By the time all this is done, their chance of catching the subject on foot is pretty minute.

R.Vol. VIII at 1791. Mr. Schultz also testified that there was no way for Detective Meyer to be aware of the location of the other officers or to know whether they would be available to assist in apprehending the suspect. *Id.* at 2081–82. Dr. Beckman testified as follows:

Q. In your opinion, Doctor Beckman, did Detective Meyer have any reasonable—any other reasonable alternatives at the time he fired the shot that struck Candi Ryder other than firing that shot?

A. I didn't see any other reasonable alternative at that moment when Candi Ryder was going around the building and out of his view. If Detective Meyer was going to perform his one duty as a police officer, I personally don't know what else he could have done other than fire that shot, taking into consideration his obligation to the community and public safety and sworn duty.

R.Vol. IX at 29.

Based on a careful review of the evidence presented at trial, we conclude that there was sufficient evidence to support the jury's verdict that the use of deadly force was necessary to prevent Ryder's escape.

---

After determining that the district court correctly applied *Garner* retroactively to this case, the Sixth Circuit reversed and remanded the case, holding that it was error for the district court to deny the plaintiff's motion for judgment n.o.v., following a jury verdict for the defendant. In so holding, the court attributed great significance to the police officer's testimony that he shot the suspect only "because he had caught him in a burglary and Carter [the suspect] was in the act of fleeing from a burglary." *Id.* at 226–27. The police officer's testimony further indicated "that at no time did he feel that his life, or the life or well-being of any other person, was threatened." *Id.* at 227.

■ Finally, we are unpersuaded by Ryder's assertion that Detective Meyer was aware of her last name and address and therefore did not need to employ deadly force to arrest her. As we have already stated there is no evidence suggesting that at the time he began his pursuit, Detective Meyer knew, or should have known, that the suspect he was chasing was, in fact, Ryder. Therefore, the jury could have found Detective Meyer's knowledge of Ryder's address irrelevant to the question of the necessity of deadly force.

### III.

### COUNSEL MISCONDUCT

■ Ryder next alleges that the trial court erred in denying her a new trial based on the misconduct of defendants' counsel.[25] "The decison whether to grant a new trial is committed to the informed discretion of the district court." *Mid-West Underground Storage, Inc. v. Porter,* 717 F.2d 493, 502 (10th Cir.1983); *see also Brownlow v. Aman,* 740 F.2d 1476 (10th Cir.1984); *Trotter v. Todd,* 719 F.2d 346 (10th Cir.1983); *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152 (10th Cir.1981), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); *Howard D. Jury, Inc. v. R & G Sloane Mfg. Co.,* 666 F.2d 1348 (10th Cir.1981); *Bickford v. John E. Mitchell Co.,* 595 F.2d 540 (10th Cir.1979). A trial court's decision to deny a motion for a new trial will be reversed only on a showing of "clear abuse of discretion." *United States v. Latimer,* 780 F.2d 868 (10th Cir.1985); *United States v. Ramsey,* 726 F.2d 601 (10th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986); *Rodgers v. Hyatt,* 697 F.2d 899, 901 (10th Cir.1983); *Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380 (10th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982); *see generally* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2803 (1973).

Ryder's underlying contention is that the trial was unfair because an unsworn statement made by Detective Meyer to a police investigator was not produced prior to trial. The statement was given by Detective Meyer to police investigator Sergeant Dave McClimans on May 5, 1981. The statement, which Ryder contends contradicts defendants' version of events, was not discovered by Ryder's counsel until near the end of trial during cross-examination of an expert witness who had been given the documents by the defendants in order to prepare his testimony.

■ As Ryder's counsel correctly notes, "[t]he misconduct of counsel or a party justifies a new trial where that misconduct prejudiced the adverse party." *Wiedemann v. Galiano,* 722 F.2d 335, 337 (7th Cir.1983); *Rodgers v. Hyatt,* 697 F.2d 899, 902 (10th Cir.1983); *Maricopa County v. Maberry,* 555 F.2d 207, 219 (9th Cir.1977); *see generally* 6A J. Moore, Moore's Federal Practice ¶ 59.08[2] (2nd ed. 1986). A showing of prejudice, however, is essential.

---

**25.** Defendants contend that Ryder should be prevented from raising this issue by her failure to timely object at trial as required by Fed.R. Civ.P. 46. The defendants suggest that since Ryder "did not complain to the court regarding any inability to utilize the statements to question appellees' witnesses ... [Ryder] failed to make a contemporaneous objection." Joint Brief of Defendants/Appellees at 25. We are keenly aware of the strong policy reasons for the basic rule that timely objection is a condition precedent to review on appeal. *See, e.g., Neu v. Grant,* 548 F.2d 281, 287 (10th Cir.1977) (the rule "provides the trial court with the opportunity to know the *specific* contentions and to take corrective action ... [and it] *does not* permit a party to sit idly by, watching error being committed....") (emphasis original).

However, in the present case, the underlying fairness of the entire trial was placed in issue by defendants' counsel when he failed to timely produce Detective Meyer's statement. Under the circumstances, we cannot overlook an issue of such importance, especially as it arises from the potential misconduct of the party invoking the timely objection rule. Accordingly, we will entertain the question of defendants' counsel's misconduct. We do so in the exercise of our own discretion and the interest of judicial fairness. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *United States v. Cheama,* 783 F.2d 165 (10th Cir.1986); *Pell v. Azar Nut Co.,* 711 F.2d 949 (10th Cir.1983); *Gomes v. Williams,* 420 F.2d 1364 (10th Cir. 1970). We, therefore, do not reach the question of whether Ryder failed to comply with Fed.R. Civ.P. 46. However, we note that a similar contention was rejected in *Greyhound Lines, Inc. v. Miller,* 402 F.2d 134 (8th Cir.1968).

*Wiedemann,* 722 F.2d at 337; *Rodgers,* 697 F.2d at 902; *Maricopa County,* 555 F.2d at 219. A new trial is not to be granted simply as a punitive measure to punish the misconduct of counsel. *See Maricopa County,* 555 F.2d at 219.

We now examine the record to determine whether the district court abused its discretion when it found that Ryder was not sufficiently prejudiced to warrant the granting of a new trial. We agree with Ryder's contention that the statements made by Detective Meyer on May 5, 1981, were both material and damaging.[26] If not suggesting that Detective Meyer perjured himself at trial,[27] the statement was suffi-ciently inconsistent with Detective Meyer's trial testimony to place the issue of his credibility before the jury. Throughout discovery and trial, Detective Meyer steadfastly maintained that prior to March 25, 1979, he was never made aware of Ryder's last name, her age, or her address. In his statement on May 5, 1981, however, he explicitly stated that he knew Ryder's last name,[28] and that she and most of the other suspects were juveniles.[29] He also informed Sargeant McClimans that he was approximately aware of Ryder's address.[30] Finally, Detective Meyer stated that at the time of the shooting he was not in immediate fear of his own life or that of other bystanders.[31]

26. The extent of Detective Meyer's knowledge regarding the names, ages, prior criminal history and addresses of the suspects that were involved that night is certainly relevant to the issue of whether Detective Meyer was in fear of bodily injury, or whether deadly force was necessary to prevent escape.

27. The trial court specifically found that "[i]n our opinion, perjury has not been clearly established." R.Vol. I at 265, p. 4.

28. Q. Okay what—just go on from there what you did, basically in sequence and best that you can recall.
A. The best I can recall, there was several calls and several meetings, and during that time we found out that a Candi Ryder was to be involved in the arm robbery—she was *planning* the arm robbery, they were told, to obtain money to buy a car for Marty Mason. I have the original letter that she wrote the day of the robbery that confirms this. I also have a statement from the lady she was living with, the original statement, that states that her father was pimping her out.
Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–6 (emphasis original).

29. Q. Okay, now at this point in time, which is sometime prior to the 25th and after the 22nd, when you got her name and stuff, were you made aware at *this* time of her approximate age?
A. yes we were.
Q. What were you told?
A. I *believe* it was sixteen, but I *do* remember it was a juvenile.
        *    *    *    *    *    *
Q. At this particular point in time, did you know the names of any other persons that were to be involved in this robbery?
A. We were told at one point I believe—well, I *know* Marty Mason, because that is who the robbery was for, to buy the car for, and I

believe Kitchkommie's name was brought up. I can't say for sure.
        *    *    *    *    *    *
Q. As far as Kitchkommie goes, was he an adult or a juvenile at that time, or do you recall?
A. He was a juvenile, but I believe he was certified to stand trial as an adult.
Q. Okay, what about Mason?
A. He was a juvenile.
Q. So at this point in time you would have believed it was going to be a juvenile subjects, the only thing was, to your knowledge, ...
A. There was supposed to have been one adult involved and I don't believe they knew the name. As it turned out there *was,* and he was the lookout for the second robbery.
Q. And so you thought there was going to be how many people, altogether?
A. That was unclear. When we first started having these conversations that night, when Officer Beach was inside, I don't even think Callender knew how many, but it sounded to me—there were several names that came up, several *people.* He didn't know the first names or last names of everybody. It sounded to me like there was going to be six or seven people involved.
Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–7, A–12 (emphasis original).

30. Q. Okay, were you informed of her status? By that I mean whether she was living with her parents or whether she was ...?
A. We did not know where she was living. Some place on west 5th is the best that I can recall, and as it turned out to be. The lady was, I don't know the exact address but it was west 5th, just east or *west* of Topeka Boulevard.
Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–7 (emphasis original).

31. Q. Okay, so you assumed it was a male. Did you make any assumptions at all about age based upon your prior knowledge that—to

Although we are in total agreement with Ryder regarding the materiality of Detective Meyer's statement, we note that Ryder was not denied the use of the statement during trial. Nor can we determine that Ryder was prejudiced by its late production. To the contrary, we concur with the district court's conclusion that "plaintiff's counsel had sufficient opportunity to employ the statements in question to plaintiff's full advantage." R.Vol. I at 266, p. 3.

After the statement was finally produced on May 6, 1985, Ryder's counsel used the statement during cross-examination of the defendants' expert witness, Dr. Beckman, for a period of over one and one-half days. Ryder's counsel also utilized the statement extensively during closing argument, pointing out the conflicts between Detective Meyer's statement and his testimony at trial, and suggesting that Detective Meyer had perjured himself. The statement was also admitted as evidence for the jury's consideration. The jury therefore had a full opportunity to review what Detective Meyer said in his statement of May 5, 1981, and to compare that statement with his trial testimony. Moreover, the trial court specifically instructed the jury that it could disregard the whole or any part of a witness's testimony if it believed the witness willfully gave false testimony. Accordingly, we must concur in the conclusion of the district court that "[f]rom the jury's verdict it is apparent that the jury either chose to believe defendant Meyer's testimony or determined that the discrepancies between Meyer's testimony and the statement in question were not material or dispositive to

the issues affecting their verdict." R.Vol I at 266, p. 4.

Ryder's counsel suggests that by not having the statements in his possession prior to trial, he was prevented from adequately cross-examining witnesses, denied adequate time to prepare Ryder's case for presentation to the jury, and was prohibited from impeaching the credibility of Detective Meyer. Brief of Plaintiff/Appellant at 24–25. We note, however, that Ryder's counsel could have recalled Detective Meyer to the stand to confront him with his statement. He could also have recalled any other witness who had testified at trial. Instead, counsel chose not to do so. We find it persuasive that counsel admitted at oral argument that his decision not to recall Detective Meyer or any other witnesses was tactical, and not based on any unfair surprise caused by the late discovery of the statement. A "court should not grant a new trial merely because the losing party can probably present a better case on another trial." 6A J. Moore, *Moore's Federal Practice* ¶ 59.08[3], pp. 59–96 (2nd ed. 1986). As we have already stated, actual prejudice is a prerequisite for granting a new trial based on the misconduct of counsel. *Wiedemann v. Galiano,* 722 F.2d at 337; *Rodgers v. Hyatt,* 697 F.2d at 902; *Maricopa County v. Maberry,* 555 F.2d at 219. Ryder has not made such a showing. Therefore, we can not say that the trial court abused its discretion in denying Ryder's motion for a new trial.

Ryder cites *Greyhound Lines Inc. v. Miller,* 402 F.2d 134 (8th Cir.1968), in support of the contention that the district court erred in denying Ryder's motion for a new trial. Though similar in several respects, *Greyhound* is distinguishable on the issue of prejudice.[32] Unlike the present

---

your knowledge at that time—you had a bunch of juveniles getting ready to rob a place, included a certified one, plus one adult? Did you have anything going through your mind as to whether or not this was *probably* a juvenile?
A. I didn't even know that it was "probably" a juvenile. The only thing that went through my mind, during those few seconds, was that I was not going to be able to catch that individual on foot, that was pretty apparent, and that ample warning had been given, plus the warning shot, and I fired to effect the arrest. I fired at the *legs* to stop them.

\* \* \* \* \* \*

Q. Now this subject, you've got to admit now, was not a "direct threat" to your life or anyone else at that particular moment. Is that correct?
A. Correct.
Statement of Detective Meyer, Brief of Plaintiff/Appellant at app. A–14, A–15, A–23 (emphasis original).

**32.** *Greyhound* involved a slip and fall case occurring at a Greyhound bus depot. The defendant, Greyhound Bus Lines, submitted interrogatories requesting details of the plaintiff's hospitalization subsequent to the accident. The defendant also requested a court order requiring the plaintiff to produce her subsequent hospital

case, in *Greyhound* the documents were never produced until the trial was completed. Accordingly, in that case, the withheld documents were never argued at trial nor submitted into evidence for the jury's consideration. There is simply no such showing of prejudice here.

▐ Although we cannot find that defendants' counsel's conduct so prejudiced Ryder as to warrant a new trial, we are deeply concerned with the ethical implications of their failure to produce Detective Meyer's statement. "Courts need not tolerate flagrant abuses of the discovery process." *Campbell Industries v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir.1980). The obligation of the judiciary to discipline lawyers for misconduct or to report the misconduct to the appropriate agency is codified in the ABA *Code of Judicial Conduct* (1984). Canon 3(B)(3) of the Code of Judicial Conduct provides that "[a] judge should take or initiate appropriate disciplinary measures against ... a lawyer for unprofessional conduct of which the judge may become aware." *See generally* "The Judicial Response to Lawyer Misconduct," ABA Comm. on Professional Discipline, IV.4 (May 1984). In the present case, we feel that counsel's conduct may warrant such a response. However, consideration of possible disciplinary action or sanctions

against counsel should be made in the first instance by the district court, and the case is remanded for that purpose.

## IV.

### JURY INSTRUCTIONS

Finally, Ryder suggests that "reversible error can be found in the district court's definition of the term probable cause." Brief of Plaintiff/Appellant at 27. Instruction No. 7 defined probable cause as follows: "Probable cause is reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person to act upon such suspicion." Ryder suggests that the trial court erred in using the word "suspicion" instead of "belief" and the "error mislead [sic] the jurors into believing that to establish a constitutional violation, plaintiff had to prove that Defendant Meyer shot Candi Ryder without even a suspicion that she posed a threat either to defendant or others in the vicinity." *Id.*

▐ At trial, however, Ryder's counsel made no objection to instruction No. 7. To the contrary, counsel specifically stated that he had no objection with the instruction as written.[33] R.Vol. XI at 176. Fed.R. Civ.P. 51 specifically requires a party to object to an instruction before its submission to a jury.[34] A court of appeals will not

records. The plaintiff never produced the records, however. The defendant first became aware of the fact that the plaintiff had been hospitalized subsequent to her accident at Greyhound at the pre-trial conference. The defendant asked the plaintiff to produce the records but did not move for a continuance. Trial then proceeded, but the plaintiff never produced the hospital records. After trial was completed, and a verdict had been returned for the plaintiff, the defendant came into possession of the records and found them to be relevant. The defendant then argued that the failure of the plaintiff to produce the hospital records was sufficiently prejudicial to the defendant that a new trial was warranted. Finding that the defendant did not waive its objection by failing to move for a continuance, and that it was prejudiced by the fact that the evidence was not submitted for the jury's consideration, the court granted a new trial.

**33.** Ryder's counsel stated with regard to instruction no. 7:

Number 7, that I have no objection to the instruction with the understanding I am re-

serving my motion for directed verdict. Obviously I contend that a verdict should be directed. Therefore, instruction 7 isn't necessary or appropriate. But with the overruling of the directed verdict, it seems to me this probably comes out of *Tennessee v. Garner.* R.Vol. XI at 176.

**34.** Fed.R.Civ.P. 51 states:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after arguments are completed. *No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.* Opportunity shall be given to make the objection out of the hearing of the jury.
(Emphasis added).

**1428**

review the propriety of a jury instruction unless counsel has timely objected to the instruction at trial. *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509 (10th Cir.1984), *cert. denied,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Moe v. Avions Marcel Dassault-Breguet Aviation,* 727 F.2d 917 (10th Cir.), *cert. denied,* 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984); *Hidalgo Properties, Inc. v. Wachovia Mortgage Co.,* 617 F.2d 196 (10th Cir.1980). Only in the event of plain error could objections to instructions warrant reversal where such objections were raised for the first time on appeal. *EEOC v. Prudential Fed. Sav. & Loan Ass'n,* 763 F.2d 1166, 1174 n. 5 (10th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *Aspen Highlands,* 738 F.2d at 1516; *Moe,* 727 F.2d at 924; *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 685 (10th Cir.1981); *Fiedler v. McKea Corp.,* 605 F.2d 542, 548 (10th Cir.1979); *see generally* 9 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 2553, 2558 (1971). No such error appears on this record.

## V.

## CONCLUSION

We hold that the district court did not commit reversible error when it denied Ryder's motion for judgment notwithstanding the verdict, or in the alternative, a new trial. We therefore affirm the jury verdict in all respects. However, we remand this case to the district court for a determination of whether sanctions should be imposed or disciplinary action commenced against defendants' counsel for failure to comply with federal discovery rules.